UNITED STATES of America, Plaintiff,

v.

**68.94 ACRES OF LAND, MORE OR LESS, SITUATE IN KENT COUNTY, STATE OF DELAWARE, and Sally A. Dickerson, Trustee, et al., Defendants.**

**Civ. A. No. 87–174–JLL.**

United States District Court,
D. Delaware.

April 17, 1990.

542

William C. Carpenter, Jr., U.S. Atty., and Kent A. Jordan, Asst. U.S. Atty., Wilmington, Del., for plaintiff.

Clark W. Furlow and Leone L. Ciporin of Lassen, Smith, Katzenstein & Furlow, Wilmington, Del. (Joseph A. Artabane and Lisa Smith Sanders of Spriggs & Hollingsworth, Washington, D.C., of counsel), for defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

This case involves application of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, to a condemnation proceeding. The two defendant landowners in the condemnation case underlying this fee petition are Sally A. Dickerson, in her individual capacity as a landowner (hereinafter "Mrs. Dickerson"), and Sally A. Dickerson as trustee for the Trust of Harry R. Draper, her father (hereinafter "the Draper Trustee"). They seek an award of attorney fees and expenses pursuant to the EAJA. For the reasons stated below, the Court will deny defendants' request for fees.

## FACTUAL BACKGROUND

On April 3, 1987, the United States filed a complaint in condemnation for the taking of approximately 68.94 acres of land located in Kent County, Delaware.[1] (Docket Item ["D.I."] 1.) The United States' actions with regard to the 68.94 acres at issue is outlined below.

First, the United States took in fee a parcel of the 68.94 acres which is referred to as Tract 305 and consists of 20.84 acres. Tract 305 had been held by the Draper Trustee. Before the taking in fee, the United States already had a clear zone easement on 7.36 acres of Tract 305, as well as a clearance easement on the remaining 13.48 acres. (D.I. 33.)

Second, the United States took a clear zone easement on a parcel of the 68.94 acres which consists of 45.39 acres and is called Tract 305E. Before the taking of this clear zone easement, the United States had owned a clear zone easement on 2.58 acres and a clearance easement on 37.56 acres. (*Id.*) The remaining 5.25 acres of Tract 305E were unencumbered. Tract 305E, like Tract 305, was held by the Draper Trustee. (*See id.* at ¶ 7.) The Draper Trustee continues to hold the fee ownership of Tract 305E.

Third, the United States took a clear zone easement interest in a parcel consisting of 2.71 acres and referred to as Tract 307E. Before the taking, the United States had held a clearance easement on at least 2.66 acres of this land. (*Id.* at ¶ 5.) While Tracts 305 and 305E (hereinafter "the Trust property") are or were held by the Draper Trustee, Tract 307E is owned by Mrs. Dickerson individually. (*Id.* at ¶ 7.)

Upon filing its complaint in condemnation, the United States deposited in the Court's Registry the sum of $81,350, representing its initial estimate of the just compensation due to defendants. (*See id.* at ¶ 15; D.I. 4 at 12.) Defendants subsequently withdrew this money (D.I. 33 at ¶ 16.), but claimed that it was insufficient compensation. A jury trial followed to determine this issue of just compensation, and defendants recovered an additional $14,359.85 (the total award, exclusive of interest, being $95,709.85, instead of the $81,350 estimated by the United States). (*See* D.I. 37; D.I. 38; D.I. 45.) Thereafter, on February 20, 1990, defendants filed this application for attorney fees.[2] (D.I. 40.)

## DISCUSSION

■ The EAJA provides, in pertinent part, that

> a court shall award to a *prevailing party* other than the United States fees and other expenses ... incurred by that party in any civil action ... brought by or against the United States ... unless the court finds that the position of the United States was *substantially justified* or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A) (emphasis added). Thus, defendants can recover attorney fees only if, first, they are "prevailing parties," and, second, the United States was not

---

1. The land borders the Dover Air Force Base and was taken for runway extensions. (D.I. 2.)

2. Only one defendant, the Draper Trustee, actually filed the fee application. (*See* D.I. 40 at 1). However, because the application specifically seeks to establish "prevailing party" status with respect to the outcome on Tract 307E (*see id.* at 4)—which is owned by Mrs. Dickerson individually—as well as the Trust property, the Court will assume, for the benefit of defendants, that the application is also meant to cover Mrs. Dickerson's personal or individual attorney fees.

"substantially justified." [3] An additional requirement is imposed by the EAJA's definition of the term "party." The EAJA states that " 'party' means ... an individual whose net worth did not exceed $2,000,-000 at the time the civil action was filed...." *Id.* at § 2412(d)(2)(A).

## I. PREVAILING PARTY

The EAJA specifically defines the term "prevailing party," for eminent domain proceedings, as

> a party who obtains a final judgment (other than by settlement), exclusive of interest, the amount of which is at least as close to the *highest valuation* of the property involved that is *attested to at trial on behalf of the property owner* as it is to the highest valuation of the property involved that is attested to at trial on behalf. of the Government.

*Id.* § 2412(d)(2)(H) (emphasis added). "In other words, the prevailing party is the one whose testimony in court is closer to the award." H.R.Rep. No. 120, 99th Cong., 1st Sess., pt. I, at 6, *reprinted in* 1985 U.S. Code Cong. & Admin.News 132, 156. The Court will therefore examine the valuations attested to at trial to determine whether defendants "prevailed."

### A. *Valuation on Behalf of Defendants*

Throughout the trial, Mrs. Dickerson maintained—both on behalf of herself and as the Draper Trustee—that Tract 307E and the Trust property should be given the same per-acre, fair market value. Accordingly, she testified that the per-acre value of the entire 68.94 acres of land, assuming it were unencumbered, was $6,000 or $7,000. (*See* D.I. 47 at B–64.) Mrs. Dickerson's husband, Chester Dickerson, also gave testimony regarding property value. Mr. Dickerson estimated that the per-acre value of the unencumbered land for both Tract 307E and the Trust property was the same, namely $8,000 to $10,000. (*See id.* at B–105 to B–106.)

With respect to the diminution in value caused by the various easements, Mrs. Dickerson testified that she believed the clear zone easements diminished the value of the land by 90 percent, while the clearance easements reduced the land's value by 30 percent. (*See id.* at B–56, B–75.) Her husband similarly testified that clearance easements would cause a 30 percent reduction in value. (*See id.* at B–107.) But he stated that clear zone easements would reduce the land's value by 80 to 100 percent. (*See id.* at B–94 to B–95.)

### B. *Valuation on Behalf of the Government*

The only valuation testimony offered by the government was that of Mr. Arnold Goldsborough, the real estate appraiser upon whom the government has relied throughout this case. Mr. Goldsborough testified that he believed the Trust property would be worth $2100 per acre if it were not encumbered. (D.I. 48 at 25.) He further testified that a clearance easement reduced the Trust property's value by 10 percent (*id.* at 31–32), while a clear zone easement reduced the value by 40 percent. (*See id.* at 32, 37.) Tract 307E's value per unencumbered acre would be $10,000. (*Id.* at 36–37.) Mr. Goldsborough testified that value would be reduced by 25 percent because of the clearance easement (*id.* at 37), and by 75 percent because of the clear zone easement. (*Cf. id.* at 38.)

### C. *Valuation By the Jury*

The jury found that the fair market value of the Trust property, on a per-acre basis, would be $2100 if the property were not encumbered. (D.I. 37 at ¶ 1.) The jury further found that the encumbrances that did exist reduced the Trust property's value by 10 percent for clearance easements, and by 55 percent for clear zone easements. (*Id.* at ¶¶ 2, 3.) Using these findings as to diminution in value, the parties concluded that the $2100 per acre figure translated into a just compensation value

---

**3.** The United States has not argued that this case involves any "special circumstances" within the meaning of the EAJA. *See* 28 U.S.C. § 2412(d)(1)(A).

of $73,979.85 for the Trust property.[4]

The jury also found that Tract 307E, the smaller parcel of land owned by Mrs. Dickerson, had a fair market value on the date of taking of $10,000 per acre without any encumbrances. (*Id.* at ¶ 4.) The jury concluded that Tract 307E's fair market value was reduced by 10 percent for clearance easements and by 90 percent for clear zone easements. (*Id.* at ¶¶ 5, 6.) The parties agreed, using these findings as to the percentage diminution in value caused by the easements, that the just compensation due for Tract 307E was $21,730. (D.I. 45 at 6.) Thus, just compensation for the Trust property and Tract 307E totalled $95,709.85. (*Id; see also* D.I. 38.)

### D. *Valuation Closest to Jury Award*[5]

If the jury had adopted all of Mr. Goldsborough's figures for fair market value and easement adjustments, just compensation for the encumbered 68.94 acres taken by the United States would have been $76,488.10 ($62,813.10 for the Trust property plus $13,675 for Tract 307E).[6] If the jury had completely adopted defendants' lowest valuation, just compensation would have been $211,458[7] ($203,238 for the Trust property plus $8,220 for Tract 307E). Mr. Dickerson estimated fair market value to be significantly higher than his wife did. His figures for the reduction in value caused by the clear zone easements were also somewhat higher, reflecting a greater loss and therefore yielding a higher just compensation figure for the taking. Accordingly, his testimony would have produced a just compensation sum of $428,750[8] for the encumbered 68.94 acres ($409,630 for the Trust property, and $19,120 for Tract 307E).

The EAJA calls for a comparison of each side's *highest* valuation at trial. *See* 28 U.S.C. § 2412(d)(2)(H). The highest valuation offered on behalf defendants is Mr. Dickerson's just compensation figure of $428,750. The valuation offered by Mr. Goldsborough, $76,488.10, is clearly closer to the jury's finding of $95,709.85. Even if the Court used defendants' *lowest* valuation, the $234,354 figure, *see supra* note 7, it is still obvious that the government's estimation of just compensation—$76,488.10—was far closer to the jury's award of $95,709.85.

The discussion above reveals that the government is plainly the "prevailing party" if one considers the lawsuit as a whole, *i.e.* the total for just compensation for both the Trust property and Tract 307E. How-

---

**4.** For the actual calculations, see D.I. 45 (computation of judgment by counsel following verdict).

**5.** The parties in this case have assumed in their fee application briefs that the critical figure in determining which side prevailed is the total amount awarded in this lawsuit—*i.e.*, $95,709.85, the sum of the just compensation figures for both the Trust property and Tract 307E. As emphasized throughout this Opinion, however, the Trust property and Tract 307E are held by two different owners. The former is held by Mrs. Dickerson as trustee (or "the Draper Trustee"), the latter by Mrs. Dickerson as an individual. Nonetheless, because of the parties' arguments, the Court, without deciding such an approach is proper, will assume for at least part of its analysis in this section that the combined just compensation figure referred to is pertinent in evaluating which side prevailed.

**6.** In doing all of the calculations noted in this Opinion, the Court relied upon the worksheet and acreage figures agreed upon by the parties. (*See* D.I. 45.) The valuation figures used by the Court in these calculations are summarized in the text of the Opinion, *see supra* pp. 4–6, and in the table included as an appendix. *See* Appendix, *infra*.

**7.** This figure was calculated using Mrs. Dickerson's lower, fair market value estimate of $6,000 per acre of unencumbered land, and Mr. Dickerson's lower estimate of 80% for the percentage of reduction in value caused by clear zone easements. *See* Appendix, *infra*.

**8.** These calculations were made using Mr. Dickerson's $10,000 price per unencumbered acre—his highest valuation—and his figure of 100% reduction in value for clear zone easements. *See* Appendix, *infra*. (Mr. Dickerson initially testified that he believed the clear zone easements would cause an 80 to 100 percent diminution in value. He later emphasized 90 percent as an adequate estimate. However, given that in determining "prevailing party" status the EAJA calls for the highest valuation given on behalf of the landowner, the Court will use his 100 percent figure for reduction in value because this sum leads to a higher just compensation figure.)

ever, the Court will now analyze, separately, the jury's just compensation findings for each of the two properties, Tract 307E and the Trust property.

■ The jury's findings regarding the Trust property translated into a just compensation figure of $73,979.85. (D.I. 45; *see also* D.I. 37.) Mr. Goldsborough's testimony indicated a figure of $62,813.10. Defendants' highest valuation produced a just compensation figure for the Trust property of $409,630. Thus, it is obvious that the government prevailed as to the Trust property. In fact, the government's valuation of the Trust property was even closer to the jury's finding than defendants' lowest valuation of $203,238.

The Court now turns to Tract 307E. The highest valuation given on behalf of defendants was $19,120. Mr. Goldsborough's valuation on the government's behalf was $13,675. The jury's finding of just compensation for Tract 307E was $21,730. (D.I. 45.) Accordingly, the figures *arguably* support defendants' contention that the government did not prevail with respect to Tract 307E, the property owned by Mrs. Dickerson individually. For the reasons stated below, however, the Court need not decide whether winning only on the valua-

tion of Tract 307E is sufficient to qualify either or both defendants as "prevailing" under the EAJA.

### E. Mrs. Dickerson as a "Party"

■ If any "party" could possibly be said to have "prevailed" in this lawsuit because of the just compensation result on Tract 307E, it would be Mrs. Dickerson in her individual capacity, as owner of that parcel of land.[9] The Draper Trustee (*i.e.*, Mrs. Dickerson on behalf of the Draper Trust) could not recover for the taking of Mrs. Dickerson's personal property, Tract 307E. Thus, Mrs. Dickerson as an individual would have to qualify as a "party" under the EAJA.[10]

To qualify as a "party" under the statute, Mrs. Dickerson would have to establish that her net worth did not exceed two million dollars when this suit was filed. *See* 28 U.S.C. § 2412(d)(1)(B). This she has failed to do. The affidavit submitted by defendants states only that the Draper Trust has a net worth of less than two million dollars. (*See* D.I. 40, Exhibit A.)[11] As the United States points out in its response to the application for fees, the affidavit is silent as to Mrs. Dickerson's *personal* net worth.[12] (*See* D.I. 42 at 6–7.)

---

**9.** This result is ironic since throughout this case Mrs. Dickerson, both on her own behalf and as the Draper Trustee, has staunchly asserted her belief that the Trust property and Tract 307E should be treated as one piece of land. In fact, Mrs. Dickerson's testimony at trial indicates that she considers the fact that she holds one of the properties as trustee and the other as an individual to be inconsequential. (*See, e.g.,* D.I. 47 at B–49 to B–51.)

**10.** It is not clear from the fee application that Mrs. Dickerson is requesting attorney fees for herself as an individual landowner of Tract 307E. *See supra* note 2. Nevertheless, for the purpose of its analysis, the Court will assume that Mrs. Dickerson *is* attempting to recover her fees.

**11.** The Court notes that the affidavit does not provide any calculations or figures to support the assertion therein that the Trust's net worth is less than two million dollars. The United States rightly points out that the unexplained conclusion as to the Draper Trust's net worth is, therefore, at least somewhat suspect in light of the fact that Mrs. Dickerson's testimony at trial put the Trust property's value *after the taking* at

over 3.1 million dollars. The jury's own findings placed a 1.1 million dollar value on the Trust property after the taking. (*See* D.I. 45 at 3, ¶ 4.)

Defendants do not satisfactorily rebut the government's arguments. They state only that the government's objections are based on the "erroneous" assumption that "value" and "net worth" are equivalent. (D.I. 43 at 5.) They do not, however, provide any evidence to support their estimate of the Trust's net worth. Nevertheless, because it is clear that the Draper Trustee did not "prevail," the Court need not decide whether the unsupported statement in this affidavit is, alone, sufficient to establish the Draper Trustee as a "party" under the EAJA. Furthermore, because the Court concludes that the Draper Trustee did not prevail, and that the government's position was substantially justified, *see infra*, the Court also need not decide whether the Draper Trustee (or the Trust) qualifies as an "individual" under the EAJA's definition of "party." *See* 28 U.S.C. § 2412(d)(2)(B).

**12.** Defendants' rebuttal to the government's memorandum in opposition to the award of fees addresses the argument that Mrs. Dickerson's

In sum, the Court holds that defendants are not "prevailing parties" within the meaning of the EAJA. First, Mrs. Dickerson (in her individual capacity as owner of Tract 307E) is not a "party" under the EAJA because she has not established, or even alleged, that her personal net worth is under the statutory cap; and, second, the Draper Trustee, although arguably a "party," did not "prevail" because her side's valuation of the Trust property was not as close or closer to the jury award than the United States' valuation. Alternatively, the Court holds that even if defendants could meet these threshold requirements under the EAJA, they would still not be able to recover fees in this case because the United States was substantially justified in its position.

## II. SUBSTANTIAL JUSTIFICATION

Assuming, again without deciding, that defendants could be said, first, to be "parties" and, second, to have "prevailed" within the meaning of the EAJA, the question then becomes whether the United States' position in this case was "substantially justified." *See* 28 U.S.C. § 2412(d)(1)(A). The Supreme Court has interpreted this phrase in the EAJA to mean " 'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). In other words, the position of the United States must have a "reasonable basis both in law and in fact." *Id., quoted in Russell v. Heckler*, 866 F.2d 638, 639 (3d Cir.1989).

■ The Court has not been able to find, and neither side has cited to, any Third Circuit case applying the EAJA's "substantially justified" standard to a condemnation proceeding. But in other types of EAJA cases, the Third Circuit has interpreted this phrase as requiring the government's position to be "solid and well-founded." *Taylor v. Heckler*, 835 F.2d 1037, 1042 (3d Cir.1988). The United States bears the

burden of demonstrating that its position was substantially justified, and the Third Circuit has characterized this burden as a three-part test:

> In order to prevail [in showing that its position was "substantially justified"], the government must show: 1) a (solid and well-founded) basis in truth for the facts alleged; 2) a (solid and well-founded) basis in law for the theory it prepounded [sic]; and 3) a (solid and well-founded) connection between the facts alleged and the legal theory advanced.

*Id.* (citations omitted). The government must meet this test for its pre-trial stance as well as for its arguments at trial. *See Garcia v. Schweiker*, 829 F.2d 396, 398 n. 2 (3d Cir.1987).

For the reasons stated below, the Court finds that the United States has met its burden. Its position was substantially justified. Accordingly, even if defendants were "prevailing parties," they would not be entitled to recover attorney fees.

### A. *Factors to Consider*

■ Although the Third Circuit has not addressed the issue, several other courts of appeals have dealt with the substantially justified standard in condemnation proceedings. The approach taken by the Fourth and Eighth Circuits, for example, is to "focus upon the relationship between the government's offer, the appraisals, and the valuations established by the government's expert witness during trial...." *United States v. 341.45 Acres of Land*, 751 F.2d 924, 940–41 (8th Cir.1984) (footnote omitted), *vacated without opinion*, 786 F.2d 1168 (8th Cir.1986), *quoted in United States v. 312.50 Acres of Land*, 851 F.2d 117, 118–19 (4th Cir.1988); *cf. United States v. 1,378.65 Acres of Land*, 794 F.2d 1313, 1319 (8th Cir.1986). This is the "test" advocated by the United States.

Defendants, on the other hand, urge a more detailed inquiry, focusing on the to-

---

affidavit is insufficient to establish that the net worth of the Trust is less than two million dollars. (*See* D.I. 43 at 5; *see also supra* note 11.) Conspicuously absent, however, is any

statement of Mrs. Dickerson's personal net worth, or any explanation or argument as to why her personal net worth might not be relevant. (*Cf.* D.I. 43 at 5.)

tality of the circumstances of the case, including the government's efforts to resolve the dispute before trial. *See United States v. 640.00 Acres of Land,* 756 F.2d 842, 850 (11th Cir.1985); *United States v. Charles Gyurman Land & Cattle Co.,* 836 F.2d 480, 485 (10th Cir.1987). Essentially, such an inquiry involves consideration of the following factors:

(1) The reasonableness and reliability of the government's appraisals introduced into evidence based on the

(a) qualifications of the appraiser;

(b) impartiality or lack thereof of the appraiser (for example, it might be important to know how often he or she was employed by the government);

(c) factual basis of the appraisal; specifically, the reasons the appraisal differs from that of the landowner;

(d) awards and sales of similar property in the area at or about the time in question;

(e) whether the comparable sales used by the appraiser were in fact comparable;

(2) A comparison of the government's appraisal, the offer made, and proof of valuation at trial;

(3) Any explanation offered by the government as to discrepancies between its offer, the appraisal(s), and trial evidence;

(4) The good faith, or lack of it, of the government in trying to reconcile the dispute prior to litigation; and

(5) Any other relevant evidence.

*United States v. 313.34 Acres of Land,* 889 F.2d 814, 817–18 (9th Cir.1989) (footnote omitted), *modified,* 897 F.2d 1473 (9th Cir. 1989) (WESTLAW, 1989 WL 197111).

Because the inquiry urged by defendants encompasses the considerations relevant to the more limited approach advocated by the United States, the Court will review the government's case for substantial justification using defendants' standard.

B. *Evaluation of Government's Appraisal*

Throughout this case, both before and during trial, the United States relied upon the appraisals prepared by Mr. Goldsborough. Mr. Goldsborough has been a real estate appraiser for over half a century, and he has appraised real estate throughout the state of Delaware. (*See* D.I. 48 at 2, 3.) With respect to Kent County, the location of the land at issue here, Mr. Goldsborough testified that during the last thirty years he had appraised property in that area between thirty to thirty-five different times. (*Id.* at 3.) The Court finds that Mr. Goldsborough is thoroughly qualified as an appraiser.

■ The Court further finds that Mr. Goldsborough was sufficiently impartial. Although he has often appraised property for government entities, Mr. Goldsborough testified that he has also done appraisals for landowners whose property is being condemned by the government. (*Id.* at 4.) Even more importantly, Mr. Goldsborough stated that the appraisal work he does for the government constitutes less than five percent of his business. (*Id.* at 5.)

■ With regard to the substance of his appraisal, the Court concludes that Mr. Goldsborough's opinion was both reasonable and reliable.[13] An important dispute in this case was the per-acre value of the land without encumbrances. Mr. Goldsborough determined that Tract 307E was worth $10,000 per unencumbered acre, while the Trust property was worth only $2100. He attributed this difference in value to two factors. First, he testified that large tracts of land usually sell for less money per acre than smaller tracts. (*See*

---

**13.** Mr. Goldsborough testified that, in performing the appraisals here in question, he worked with a Mr. Robert Appel. (D.I. 48 at 8.) Mr. Appel, a qualified appraiser himself, had worked for Mr. Goldsborough in the past and assisted him with much of the "legwork" involved in the appraisals in this case. In particular, Mr. Appel helped to gather the data on comparable sales. Mr. Goldsborough testified, however, that he reviewed all of Mr. Appel's work and personally viewed the properties used as comparable sales. (*Id.* at 9.) Mr. Goldsborough's reliance upon the assistance of Mr. Appel does not in any way undermine the Court's confidence in Mr. Goldsborough's qualifications or work product. Indeed, Mrs. Dickerson herself characterized Mr. Goldsborough's work as "thorough." (D.I. 47 at B–76.)

D.I. 48 at 11, 90–91.) Secondly, Mr. Goldsborough testified that the Trust property and Tract 307E had different "highest and best uses." (*See id.* at 26.) Mr. Goldsborough explained that, after taking into account various zoning restrictions, he concluded that the highest and best use for the Trust property was farmland.[14] (*See id.* at 13–15.) He valued Tract 307E separately because that parcel was held under a separate deed and was owned by Mrs. Dickerson individually. (*Id.* at 25.) Although, as was the case with the Trust property, Mr. Goldsborough believed that Tract 307E could not be subdivided, the existing zoning requirements would have permitted putting a single home on the land. (*Id.* at 26, 94–95.) Thus, the highest and best use of Tract 307E was residential.[15]

Defendants do not argue that the properties which Mr. Goldsborough relied upon as comparable sales were in fact not comparable to the land at issue here.[16] (*Cf.* D.I. 40 at 9–10.) Rather, they take issue with the fact that Mr. Goldsborough's evidence of comparable farmland sales focused only on purchases made by a Mr. Cartanza. In particular, defendants pointed at trial to the fact that Mr. Goldsborough did not include as one of his comparable sales a farmland purchase made by Mr. and Mrs. Dickerson themselves. (*See* D.I. 47 at B–127.)

■ The Court finds that the government was justified in relying on Mr. Goldsborough's comparable sales data. Mr. Goldsborough explained that the Dickersons' purchase, made only four months prior to the takings in this case, might have occurred too close in time to his appraisals for him to have found any record of the sale. (*Id.*) His testimony also indicated that it was unlikely he missed any other sales because "there are so few farms right in that area...." (*Id.*) It is significant that all of the comparable farmland sales were purchases by one buyer, the Cartanza Farm. Nevertheless, the government was substantially justified in relying on the data because these purchases involved various sellers. (*See, e.g.,* D.I. 48 at 19, 23.) Moreover, Mr. Goldsborough testified that Mr. Cartanza was the "market maker" in that part of Kent County, Delaware, and that he paid "top dollar" for his purchases.[17] (*See id.* at 68.)

■ Defendants' final argument is a challenge to Mr. Goldsborough's testimony

---

14. Mr. Goldsborough testified that residential subdivision of the Trust property would not only have been against the pertinent zoning regulations, but would also not have been feasible because of the easements on the land and the noise caused by planes landing and taking off. (*See* D.I. 48 at 14–15, 26–31.)

15. Mr. Goldsborough was swayed by the fact that there was a single house on the land adjacent to Tract 307E. Thus, although he thought it was unlikely that someone would want to build a home and live on Tract 307E, given the land's proximity to the expanded air force runway facilities, Mr. Goldsborough also believed Mrs. Dickerson was entitled to the benefit of the doubt. (*See* D.I. 48 at 25–27.)

According to Mr. Goldsborough, considering the two properties as separate entities for valuation purposes was to Mrs. Dickerson's benefit. (*Id.* at 94–95.) He testified that if he had not considered the Trust property and Tract 307E as separate parcels, the value of the Trust property would not have gone up. Rather, the value of Tract 307E, the smaller parcel, would have gone down. Mr. Goldsborough indicated that, instead of being valued at $10,000 per unencumbered acre, Tract 307E's value would have been closer to the $2100 figure given for the Trust property. (*See id.* at 38–39.)

16. Even if they were to make such an argument, the Court would reject it. Mr. Goldsborough compared the Trust property with other farmland sales in the area, and Tract 307E with other residential lot sales. (*Cf.* D.I. 48 at 33.) Moreover, he made specific adjustments in his calculations, either upwards or downwards, to account for the differences that did exist between the land at issue here and the properties to which this land was being compared. For example, Mr. Goldsborough took into account any differences in the percentage of tillable soil, the time of the sale, the size of the property, and the existence of any easements or other encumbrances. (*See, e.g., id.* at 21–22.)

17. The Court would also note that using the Dickersons' 1986 farm purchase as a comparable sale would not have helped defendants' position. In fact, this purchase supports the conclusion that the government's position was substantially justified. Mrs. Dickerson testified that the farmland she purchased was $193,000 for approximately 169 acres. (D.I. 47 at B–80.) That sum works out to a per-acre price of $1,142. Even if only tillable acres were considered, Mr. Dickerson testified the price was $3,000 per tillable acre. (*Id.* at B–111.)

as to the diminution in value caused by the various easements. They contend that the government's appraisals do not consider the full range of land use restrictions encompassed in the taking of a clear zone easement. The Court rejects this argument. Mr. Goldsborough's testimony reflected detailed consideration of the effect of easements on the properties at issue in this case. (*See, e.g., id.* at 29–31 [discussing clearance easements], 32–33 [clear zone easements].) For example, at trial defendants attempted to prove that clear zone easements diminished the value of farmland by a far greater percentage than estimated by Mr. Goldsborough. (*See, e.g.,* D.I. 47 at B–95.) The government's position on this issue was, however, clearly justified. In explaining his conclusions as to the effect on value of clear zone easements, Mr. Goldsborough testified that a seven-acre piece of the Trust property, already encumbered by a clear zone easement prior to the taking, was still being used for agriculture when the taking occurred. (*See* D.I. 48 at 32–33.) Mr. Goldsborough also testified that he had relied on "the opinion of the farmer next door who said it didn't hurt him a bit to farm in the clear zone easement right up to the air base." (*Id.* at 62.)

### C. *Appropriateness of Government's Position on Valuation*

 The next set of relevant criteria, namely a "comparison of the government's appraisal, the offer made, and proof of valuation at trial," *313.34 Acres,* 889 F.2d at 818 (footnote omitted), also lends support to the position taken by the United States in this case. First, the government's pre-trial deposit into the Court's registry was $81,350, the figure initially estimated to be the just compensation due for both the Trust property and Tract 307E. Mr. Goldsborough testified that this sum was derived from his first appraisal of the Trust property and Tract 307E. (*See id.* at 40–41.) Mr. Goldsborough's second appraisal [18] arrived at a lower valuation, which translated into the lower total just compensation figure of $76,488 attested to at trial. The only other figure mentioned by the government was a pre-trial offer to settle for "a figure under $100,000." *See infra* pp. 21–23.

These three figures demonstrate the government's faith in, and reliance upon, Mr. Goldsborough's appraisals. It is obvious that, throughout this case, the government was acting in accordance with the just compensation figures supplied by Mr. Goldsborough and attested to at trial.[19] The only "discrepancy" the Court can detect is the fact that the government's pre-trial deposit into the Court's registry ended up being higher than the just compensation figure advocated by Mr. Goldsborough at trial.[20] As stated above, however, Mr. Goldsborough himself explained at trial

---

**18.** Mr. Goldsborough testified that he was asked to do a second appraisal of Tract 307E because the government had not completed its taking of this land within the required time period. (D.I. 48 at 39; *see also id.* at 45–46.)

**19.** Defendants claim that at trial the government argued that the smaller parcel, Tract 307E, should be valued at the Trust property's lower value of $2100 per unencumbered acre—allegedly making the government's position at odds with its own appraisal. This is not quite accurate. The government argued, as an alternative position, that if the jury did not accept Mr. Goldsborough's rationale for giving Tract 307E a much higher value per unencumbered acre than the Trust property, it should then value both properties at the $2100 figure calculated for the Trust property. Mr. Goldsborough's testimony *supported* this alternative argument. *See supra* note 15.

**20.** Defendants underscore this point. They also contend that they "did not receive a satisfactory explanation of the Government's offer...." (D.I. 40 at 9.) Defendants knew, however, at least as early as June 19, 1987, when the United States responded to their interrogatories (*see* D.I. 11), that the government's initial just compensation estimate was based on Mr. Goldsborough's first appraisal of the 68.94 acres. Subsequently, in January of 1988, defendants received a summary of Mr. Goldsborough's appraisal report. (D.I. 22 at 1.) In March of 1989, counsel for the United States wrote to defendants' counsel, again summarizing Mr. Goldsborough's findings and his anticipated trial testimony. (*See id.,* Exhibit 4, at 3.) The United States supplemented its answers to defendants' interrogatories in June of 1989, again including all of the requested information as to the government's just compensation figures. (*See id.,* Exhibit 4.) These latter two communications spe-

that the higher sum initially advocated by the government was supported by his first appraisal. (*See id.*) Mr. Goldsborough also adequately explained what caused him to conclude, after his second appraisal, that a lower just compensation figure was appropriate.[21]

### D. *Government's Good Faith Before Trial*

■■■■ Defendants argue that "[t]he Government made no offer of settlement beyond its initial deposit in the Court's registry...." (D.I. 40 at 9.) The United States strongly disputes this. It first points out that, in accordance with federal law, a settlement offer was made before suit was filed. (D.I. 42 at 6 n. 4.) When that offer was rejected, the amount offered, $81,350, was deposited into the Court's registry, and suit was filed. (*See id.*) The United States further contends that it made a subsequent settlement offer after a pre-trial conference held in this case on December 7, 1989:

> [F]ollowing the pre-trial conference ... counsel for the United States conferred with defendant's counsel and stated that if the defendant would accept *a figure under $100,000* as just compensation, then counsel for the Government would press for authority to settle the case and was confident such authority could be obtained. That overture was *rejected.*

(*Id.* [emphasis added].)

In their reply memorandum, defendants do not directly contradict the government's assertions. They instead simply recharacterize their initial allegation that the government "made no offer of settlement":

> The United States made *no formal offer* of settlement beyond the $81,350 deposited in the Court's Registry. Plaintiff concludes that asking Defendant to "accept a figure under $100,000" to settle the issue of just compensation constitutes a *reasonable attempt to settle*, even though that is precisely where the Government figure began.

(D.I. 43 at 4 [emphasis added].)

Whether the offer following the pre-trial conference was "formal" or "informal," the Court has no doubt it was serious.[22] The Court also finds that this offer was reasonable. The government made an initial offer of $81,350 based on Mr. Goldsborough's first appraisal. When this offer was rejected, the government raised its offer to a figure under $100,000. In the interim, Mr. Goldsborough had done a second appraisal, which suggested a just compensation figure that was even *lower* than the government's initial offer. The government's second offer, which promised a sum that was *higher* than its first appraisal, was thus clearly reasonable and demonstrated its good faith in trying to settle out of court.[23]

### E. *Government's Position Was Substantially Justified*

Having considered the United States' position before and at trial, and the extent to

cifically addressed the fact that the government believed, and would advocate at trial, that the just compensation due to defendants was less than the sum initially deposited in the Court's registry.

21. Mr. Goldsborough testified that when he did his second appraisal, the property had a lower market value because market prices for comparable properties had simply gone down. (*See* D.I. 48 at 39–40.)

22. The pre-trial conference referred to took place *in chambers*, in the Court's presence. Similarly, the offer to press for authority to settle for a figure under $100,000 was made in the Court's presence.

23. Defendants claim that the government did not really try to settle because it refused to "compromise." Ironically, they attempt to support this argument by alleging that the government "summarily rejected ... [their] use of less expensive alternatives for valuation such as a consulting report ..." (D.I. 43 at 4), which "advocated a settlement figure of $120,000." (*Id.* at 4 n. 3.) What defendants fail to note, however, is the fact that this $120,000 figure—allegedly "never considered" by the government—renders the government's pre-trial offers even more reasonable. At the very least, it cannot be disputed that the three sums proffered by the government ($76,488.10, $81,350, and "a figure under $100,000") are far closer to and within the ballpark of the $120,000 figure, supposedly not even considered, than the two sums urged by defendants, *i.e.*, $428,750, *see supra* note 8 and accompanying text, and $211,458. *See supra* note 7 and accompanying text.

which it was supported by reasonably reliable evidence, the Court concludes that the government has met its burden of demonstrating its position was substantially justified. That is, the Court finds that the government's position, both before and during trial, was justified to a degree that would satisfy a reasonable person. Accordingly, even if defendants could be said to have prevailed in the condemnation proceeding underlying this fee application, they would not be entitled to attorney fees. An appropriate order follows.

## APPENDIX
## PROPERTY VALUATION