**UNITED STATES of America**

v.

**Richard GLADSTONE, et al., Defendants.**

**No. 00 CR. 652(RO).**

United States District Court, S.D. New York.

May 10, 2001.

Mary Jo White U.S. Atty., by Stefanie B. Isser & Mei Kin Kwan-Gett, Asst. U.S. Atty's, New York City, for U.S.

John F. Lauro, Law Offices of John F. Lauro, Tampa, FL, for defendant.

## OPINION & ORDER

OWEN, District Judge.

■ Defendant Richard Gladstone was acquitted following a four week trial before me for securities fraud and two and one-half days of jury deliberation. He now moves for attorney's fees and expenses pursuant to the Hyde Amendment,[1] asserting he meets its requirement of showing that the prosecution of him was "vexatious, frivolous . . . or [in] bad faith."

In June 2000, a Grand Jury had indicted him and three others, Howard Helfant, Gus ("Tommy") Geldman and Robert Wade, charging violations of the federal securities laws, and specifically that Gladstone owned and controlled IvyEntertainment.Com, Inc. and that he deliberately concealed material information from investors in the sale of Ivy's promissory notes by failing to disclose to them (1) the enormous (in some cases fifty percent) amount of secret commissions paid to brokers and others selling the notes, and (2) that much of the proceeds raised in the private placements would be used by Gladstone and another conspirator for personal purposes in violation of 15 U.S.C. §§ 77q(a) and 77x. The Gladstone case tried before me was but one of eleven indictments arising from some one thousand hours of court-ordered bugging of the offices of DMN Capital,[2] Gladstone in his moving papers putting before me its reputation as a mob-operated financial firm located in lower Manhattan.[3] (Aff. of John F. Lauro, Ex. 1.)

The trial began on December 13, 2000. Over the next four weeks, the Government called eighteen witnesses and introduced numerous tape recordings made under FBI surveillance, bank records and filings with the Securities and Exchange Commission. The Government's evidence included the testimony of victim-investors who stated that various sources, such as the "brokers"[4] themselves and/or the two offering

---

1. Pub.L. No. 105–119, § 617, 111 Stat. 2440, 2519 (1997), *reprinted in* 18 U.S.C. § 3006A.

2. These cases include: *United States v. Downing*, 00 Cr. 555(KTD), which resulted in convictions, *United States v. Trippe*, 00 Cr. 585(SWK), *United States v. Dacunto*, 00 Cr. 620(AGS), *United States v. Wolfson*, 00 Cr. 628(JGK), *United States v. Wager*, 00 Cr. 629(TPG), *United States v. Brigandi*, 00 Cr. 630(LAP), *United States v. Greyling*, 00 Cr. 631(RCC), *United States v. Lino*, 00 Cr. 632(WHP), *United States v. Gasparick*, 00 Cr. 652(SAS) and *United States v. Laken*, 00 Cr. 651(SHS).

3. In his affirmation in support of the fee application, Gladstone's counsel attached several press articles from the Palm Beach Post and the Washington Post revealing the Mafia's reputed ties to DMN Capital. (Aff. of John F. Lauro in Support of Richard Gladstone's Motion for Attorney's Fees and Expenses, at Ex. I.)

4. While Scott Liese, a corrupt broker responsible for sales to at least two of the victim-investors, did not testify at trial, statements by him to others were admitted, under Fed. R.Evid. 801(d)(2)(E), as a co-conspirator's statements made in furtherance of the conspiracy. I note that while Liese did not appear at the trial, he did attend a proffer meeting at the U.S. Attorney's Office with his counsel, presumably to see if cooperation was an option. While statements at Liese's proffer session were, by virtue of his proffer agreement, inadmissible at trial, they do bear directly on Gladstone's request for attorney's fees given his accusations as to the Government's state of mind in undertaking the prosecution. In its opposition papers, the Government proffers that "[L]iese advised [the Assistant United States Attorney] and [the FBI Agent] that he knew Howard Helfant, Richard Gladstone and Gus Geldman, that he raised approximately $120,000 for Ivy, that he spoke with Helfant, Gladstone and Geldman, and received $25,000 to $35,000 in cash as a result of his efforts in recruiting brokers." (Gov't Mem. of Law. in Opp. to Def.'s

memoranda, indicated the brokerage commission would be "usual" or in the area of ten percent—or that they were told nothing; and were further told that the proceeds of the offering would be used for the benefit and advance of the company.

Among other witnesses, Bernard Thomas, an alleged co-conspirator and cooperating witness, testified that he met Gladstone through co-defendant Gus Geldman in early 1999 and, subsequently, learned of the Ivy deal. Geldman informed Thomas that he (Geldman) made a deal with Gladstone to obtain a fifty percent commission on the sale of Ivy securities. Geldman sought Thomas' assistance in selling the notes and offered to share a portion of the fifty percent commission. Thomas testified that these payments were in fact made. Thomas also testified that, at the direction of Gladstone and Geldman, he met with Liese and offered a twenty percent commission if Liese raised under $100,000 and a twenty-five percent commission if he raised over $100,000. Thomas further testified about a twenty-five percent commission he offered, after consulting with Gladstone, to Sean Campbell, one of the Government's cooperating witnesses whom Thomas met through co-defendant Robert Wade. After this conversation, Thomas testified that Campbell's FBI-created fictitious client invested $10,000 in the private placement and Thomas received a commission of $4,000, or forty percent, from Ivy's bank account. Thomas stated that he paid Campbell $2,500 and kept the rest for himself. Bank records confirmed the transaction.

FBI Agent Kevin Barrows testified regarding certain unusual pre-arrest and pre-indictment statements by Geldman in which he told Barrows that he wanted to cooperate, that Ivy was a fifty percent deal with Gladstone and that he paid thirty-five percent in commissions or more to Thomas or others if they found an investor for Ivy.[5] Barrows also supervised Follick in later taped conversations with Geldman. In one conversation, the transcript of which is quoted hereafter, Follick told Geldman about a possible investor (actually created by the FBI) who would invest $5,000 in the Ivy private placement and Geldman offered Follick a forty percent commission with a twenty-four hour turn around on getting his money, Geldman keeping ten percent for himself. Geldman also told Follick that Gladstone was behind Ivy and would confirm that there would be no problem getting paid, which Gladstone did.

Request for an Award of Attorney's Fees, at 16 n. 4 .)

5. Once again, while inadmissible at trial, but significant with respect to Gladstone's request for attorney's fees because of its evidence of the Government's good faith in the prosecution, Geldman made further incriminating statements about Gladstone at two proffer sessions he attended on September 12 and September 14, 2000 with the U.S. Attorney's Office. See Gov't Mem. of Law in Opp. to Def.'s Request for Award of Att.'s Fees, at 17 n. 6 & Ex. C. The Agent's notes from the proffer, in an FBI 302, also indicate that Geldman had done previous undisclosed excessive commissions deals with Gladstone in securities offerings for companies called United Ventures Group International (UVGI) and Sterling Worldwide (STWW). There was testimony at trial, pursuant to Rule 404(b) and as background to the conspiracy, about exorbitant sales commissions in offerings of UVGI and STWW which implicated Gladstone. In addition, Geldman's proffer FBI 302 makes note of Leslie Greyling. Greyling was mentioned in a taped conversation admitted at trial between Gladstone and Jeffrey Pokross, another Government cooperating witness, who is the principal of DMN Capital and a known associate of the Bonanno crime family. See supra note 3. Gladstone and Pokross discussed a business deal to manipulate the trading activity of Eutro Holdings Group, a/k/a Strategic Alliance, by, among other things, bribing brokers.

Bank records confirmed the transactions.[6] The transcript of the above conversation, recorded on September 7, 1999, begins with Geldman on the line with Follick and defendant Howard Helfant and reads in relevant part:

Gus Geldman: Okay, now this is what . . . I'm bringing this guy in personally here, Howie.

Howard Helfant: Right.

Geldman: All right? I . . . just like the other guys I brought in, you know they . . . the best investors in Ivy are mine. Are we . . . a, a, agree on that, right?

Helfant: Yes, yes, we have.

Geldman: Okay.

Helfant: And you know the merger is taking place pretty shortly.

Geldman: Uh . . . exactly. And what I'm telling you now is that Bruce will always do the right thing. Okay? He's stand up or I wouldn't even put him on the phone with you. Okay? Uh . . . and basically I told him . . . uh . . . and I want Bruce to know that I told you basically uh . . . his four will go directly through you guys and the one [7] that I'm taking, I'm actually holding back until . . . and ensure the paperwork is done right, right?

Helfant: All con . . . consulting fees should be paid according to what Tommy told you.

Geldman: Okay?

Helfant: That's all I'm gonna tell you over the phone.

Geldman: Fair enough, exactly right. All right, Bruce?

Bruce Follick: So . . . uh, uh . . . wait a minute, I didn't . . . who's Tommy?

Geldman: I'm Tommy.

Helfant: Oh, I call him, Gus, Tommy. Yeah.

\*     \*     \*     \*     \*     \*

Follick: . . . so uh . . . the bottom line, if a wire comes in today for five, I'm seeing two back or what?

Helfant: Or you'll get . . . you'll probably receive it tomorrow morning. You know, it depends what time of the day, I mean, I don't sit by the phone, but I, if I get a phone call . . . it's either today or tomorrow, put it that way. Twenty-four hour turn-around basically. As long as I have it.

\*     \*     \*     \*     \*     \*

[Thereafter Helfant gets off the phone and Follick is alone on the line with Geldman]

Geldman: Stay there. I told you he wasn't gonna go but so far, Bruce. But . . . hold on, stay with me . . . he's not stupid. None of these people are stupid, Bruce.

Follick: And I hear you, man.

Geldman: You know. But you heard what you needed to hear, you'll get your two of your five immediately. All right? And you'll be able to call it all the way through. You'll . . .

\*     \*     \*     \*     \*     \*

Geldman: Hold on, stay with me. Just don't get so damn specific with him, all right?

Follick: All right.

---

6. Bank records also confirmed that Gladstone and Helfant, the only two signatories on the Ivy company account withdrew large sums of investor money in cash and for apparently personal items. One such is a payment to "Victoria's Secret."

7. There was uncontradicted testimony of Follick that the "four" meant forty percent and "one" meant ten percent. (Trial Transcript, at 1409–1410.)

Geldman: Ask ... you know what? I'll get him to tell you that Howard ...

Follick: If you want I won't even talk.

Geldman: I'll, I'll get him to say that Howard speaks for him and that you don't gotta worry. If Howard says something is gonna happen, it'll happen. How's that sound?

Follick: I just wanna hear the guy say, "Yeah, you're gonna get your money. This is what you're getting." Even if he says it ... I don't care if he doesn't say it to me, I just wanna know for sure that the guy is really gonna pay.

Geldman: All right. Don't say a fucking word.

Follick: What, what should I do, ask him for the money up front?

Geldman: No, you (unintelligible) ...

Follick: Then I know he's paying.

Geldman: No, you don't say a fucking word. All right?

Follick: All right.

Geldman: I don't want him to know, you know, you're on the fucking phone.

Follick: I won't say not a peep.

    \*     \*     \*     \*     \*     \*

Follick: Tell him you got a big guy on the street and he wants four and if he can get up to a hundred he wants forty-five.

Geldman: Um-hum, no, I can't say all of that. Right now we're gonna do just the one thing and we'll talk more in person. I'll fly to New York, all right?

Follick: All right.

Geldman: All right, let's get the first piece.

Follick: But believe it or not, you know, if I see that this guy is real I'll fu ... I'll fucking do the right thing real quick.

Geldman: Okay, well ... but I want ... we'll talk more in person. Let's get the first piece done.

Follick: 'Cause you know how it goes, man.

Geldman: Stay with me, baby.

[Pause.]

[Ringing—Gladstone joins the conversation with Geldman and Follick]

Gladstone: Tommy. Yeah, Tommy.

Geldman: Yeah, Rich.

    \*     \*     \*     \*     \*     \*

Gladstone: What's cooking 'cause uh ...

Geldman: All right, I got a guy on the phone with me, uh ... um ... Bruce. Say hi, Bruce.

Follick: Hi, how are you?

Geldman: You remember Bruce. He was ...

Gladstone: Hi.

Geldman: ... he was working with me down in Man ... in New York for awhile.

Gladstone: Oh, okay, hi, Bruce.

Follick: Hi, how are you doing?

Geldman: All right, and uh ... the deal that I told you, I worked out through Howie ...

Gladstone: Yeah.

Geldman: All right, he just wants to know that you are behind it and he doesn't have to worry that ... you know.

Gladstone: Oh, yeah, yeah, yeah. But, but Bruce, it's, it's, critical. I mean, I, I really wanna say ... I mean, you gotta get the sus ... you know, the subscription, you know?

Follick: Oh, I've been ...

Gladstone: (unintelligible) subscription done. I mean, if you're missing a, a W–9, or you know, something stupid,

don't worry about it, even though we need to get it.

Geldman: Right.

Follick: Believe it or not, Gus knows me and I'm, I'm good with the paperwork . . .

Gladstone: (unintelligible) . . .

Follick: . . . like that.

Gladstone: . . . if he's accredited and, you know . . .

Geldman: Rich, he's good.

Gladstone: He's in the right state, and . . . you know . . .

Follick: Yeah.

Gladstone: . . . otherwise, if you send us the money, it's, it's like a, a . . . it's a tease.

Geldman: Yeah.

Gladstone: You know, 'cause . . . I almost rather not have the money.

Geldman: Rich. I just . . . two things I didn't . . .

Gladstone: But if you can get us a couple of the basic . . . you know, subscription document, you know, uh . . . questionnaire, I think, you know, uh . . .

Follick: Believe me, I'm a stickler with the . . . I'm a stickler with the documents myself. I can . . .

Gladstone: (unintelligible).

Geldman: Rich, he's, he's real good with docs, Rich.

Gladstone: Then, then, then you, you know, then . . . yeah. We're talking . . .

Geldman: He's . . .

Gladstone: . . . talking about a twenty-four hour turnaround.

Geldman: Okay, I told him basically it'll be four . . . and he'll get four, I'll get one, and I told him I'll leave my one back until all paper is right.

Gladstone: Well, I'd like to think the paper is gonna be right from the get go.

Geldman: No, I'm just saying for this first transaction, dude. If it . . .

Follick: Yeah.

Geldman: No, (unintelligible) . . .

Gladstone: You're right, but, but, but if it's the . . . if it's not a hundred percent right, just get the, get the important documents right. You know the questionnaire, the . . . you know?

Geldman: Yeah. No, no, I, I, I . . .

Gladstone: Because for all I know . . . I mean, I saw a W–9 in there and fucking weird thing, you know?

Geldman: Yeah, no, all I'm saying, Rich, is on the first one he, he, he just wants to see the turn around, know everything is correct.

Gladstone: Right, I understand.

Geldman: All right? I have . . .

Gladstone: Thank you, Bruce. I'm in a meeting uh . . . another deal we're gonna be doing uh .. Eutro.

Follick: Yeah.

Gladstone: (unintelligible) but I'm with the chairman of the board, so I really gotta go.

Follick: Wait, can I ask you a question?

Gladstone: Yes.

Follick: If, if I, if I show you the paperwork, it's right on a very consistent basis, and I. and I could do maybe a hundred plus, can I get up to forty-five?

Geldman: We'll talk about it.

Gladstone: That's between you and Tommy, I'm . . . I, I, I mean, I'm stuck at a number that I did for Tommy because it really . . . I almost, you know, it's like a, like a ten percent commission and anything over that is really uh . . . an investment that I

make because um ... you know, and, and that's through ... between you two guys 'cause I'm trying to help out ... Tommy, build, you know, the Baxter Bank offices.

Geldman: Okay, Rich.

Gladstone: Last, last I heard they're going on the cover, right, right, Tommy?

Geldman: Yes, sir, I'm working that out right now. You gotta call me later, okay?

Follick: So then ... uh ... hello.

Geldman: Go ahead, Bruce.

Gladstone: (unintelligible)

Follick: If he, if he gives me the green light and says yes I can have it, then I know I'm gonna get it? I can always call you and cry if he doesn't do the right thing?

Gladstone: Whatever, whatever Tommy says, you got.

Follick: Okay.

Geldman: Okay?

Gladstone: Okay?

Follick: All right.

Gladstone: I back up whatever Tommy says.

Follick: Okay.

Geldman: All right?

Follick: All right.

Geldman: All right.

Follick: Thank you very much, man, thanks for your time.

Gladstone: Talk to you later.

Geldman: All right.

Follick: Okay.

Gladstone: See you.

Against the foregoing, there is no evidence whatever from the trial record, or from the assertions in Gladstone's memoranda to support his position here that the prosecution was "vexatious, frivolous or in bad faith," regardless of what the jury concluded. Gladstone's claims that there could be no fraud because the Government made part of its case by using undercover agents and fictitious investors [8] and also because the promissory notes were not payable until 2002 are both irrelevant since the use of undercover law enforcement techniques is appropriate and because the fraud occurred when the notes were sold; and moreover because the statements in the private placement memoranda regarding commissions, excerpted below, are deliberately ambiguous and misleading:

> It is not anticipated that there will be any commissions paid in connection with the sale of the [Ivy Notes], but the Company reserves the right to retain broker-dealers on a commission basis. If any such broker-dealers are retained it is anticipated that, at a minimum, such broker-dealers would be paid a commission equal to 10% of the proceeds raised through such broker dealers. See "Use of Proceeds."

There, the "Use of Proceeds" sections of each private placement memoranda informed potential investors that approximately ninety percent of all the money raised through the sale of the securities would be used by Ivy, and for Ivy.

The Hyde Amendment states in relevant part:

> During fiscal year 1998 and in any fiscal year thereafter, the court, in any crimi-

---

**8.** Gladstone claims that the Government's bad faith was somehow demonstrated by the fact that it did not "[c]ontact Ivy's corporate counsel [a Florida lawyer, Laura Holm, of English, McCaughan and O'Bryan] before an indictment was returned [,]" asserting that such contact would have demonstrated that Ivy was a "real and legitimate enterprise." This claim has no merit because the Government called Holm as a rebuttal witness at the trial and she was available for cross-examination, which was declined by all defense counsel.

nal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act, may award to a *prevailing party,* other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was *vexatious, frivolous, or in bad faith,* unless the court finds that special circumstances make such an award unjust. *Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code [the Equal Access to Justice Act or "EAJA"]* .

Pub.L. No. 105–119, § 617, 111 Stat. 2440, 2519 (1997), *reprinted in* 18 U.S.C. § 3006A (underscoring supplied). Recovery under the Hyde Amendment is intended for cases where, as Representative Hyde stated, "[U]ncle Sam sues you, charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong. They are not just wrong, they are willfully wrong, they are frivolously wrong." 143 Cong. Rec. H7786–04, H7791 (Sept. 24, 1997); *see also United States v. Wade,* 93 F.Supp.2d 19, 22 (D.D.C.2000) (same).

I also note that while the Hyde Amendment does not define the term "prevailing party," it incorporates the procedures and limitations of the EAJA, which, is where the provisions to seek attorney's fees appear in 28 U.S.C. § 2412(b) and § 2412(d). As has been determined in numerous persuasive cases, it is § 2412(d) that applies here,[9] with its threshold proviso that an individual whose net worth exceeds $2,000,000 may not recover fees. *See* 28 U.S.C. § 2412(d)(1)(C)(2)(B). The Government has submitted on this motion a deposition excerpt in which Gladstone stated under oath on January 20, 1999 that the approximate value of his stock brokerage accounts alone, not including any other assets, income or holdings, was $3.5 million. *See Williams v. LDPA Acquisition Corp., et al.,* 96 Civ. 3079(BDP) (Dep. Tr. at 13). Gladstone, in his reply papers, did not take issue with this and I treat it as established. *See, e.g., United States v. 68.94 Acres of Land,* 736 F.Supp. 541, 546–547 (D.Del.1990). Nevertheless, he argues that the net worth threshold should not apply because it creates a "classic 'Catch 22' situation," stating in his memorandum:

If a defendant lacks financial resources, he is effectively prohibited from retaining *competent legal counsel,* and faces likely conviction even where the government has acted improperly. However a defendant who can afford *competent counsel,* in the face of an overreaching government, would not be able to seek compensation. . . .

Reply Letter–Brief, dated March 16, 2001, at 2 (underscoring supplied). Setting aside the gratuitous defamation of the public defense bar, especially the Legal Aid Society's Federal Defender Division in this district (which shared in the acquittal of one of Gladstone's co-defendants), Gladstone's position is not only unpersuasive but in my experience is contrary to fact.

■ Turning to the merits, the Hyde Amendment places the burden on Gladstone to prove that the prosecution was

---

**9.** *See, e.g., United States v. Ranger Elec. Comm.,* 210 F.3d 627, 633 (6th Cir.2000); *United States v. Peterson,* 71 F.Supp.2d 695, 698 (S.D.Tex.1999); *United States v. Gardner,* 23 F.Supp.2d 1283, 1289–90 (N.D.Okla.1998); *United States v. Knott,* 106 F.Supp.2d 174, 177 (D.Mass 2000). Only one court has held that the procedures and limitations of § 2412(d) do not apply to a Hyde Amendment application. *See United States v. Holland,* 34 F.Supp.2d 346, 358–359 (E.D.Va.1999).

"vexatious, frivolous or in bad faith." Although the Second Circuit has not defined these terms in the context of the Hyde Amendment, both the Fourth and Eleventh Circuits have held:

By its plain language, vexatious means without reasonable or probable cause or excuse. A frivolous action is groundless ... with little prospect of success; often brought to embarrass or annoy the defendant. And, bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; ... it contemplates a state of mind affirmatively operating with furtive design or ill will.

*In re 1997 Grand Jury,* 215 F.3d 430, 436 (4th Cir.2000) (internal cites and marks omitted) (citing *United States v. Gilbert,* 198 F.3d 1293, 1298 (11th Cir.1999)). Thus, notwithstanding the acquittal, this standard is in no way satisfied on this trial record. *See In re 1997 Grand Jury,* 215 F.3d at 436 ("To prevail under the Hyde Amendment, a lot more is required ... than a showing that the defendant prevailed at the pre-trial, trial or appellate stages of the prosecution." (internal cites and marks omitted)).

Gladstone has utterly failed in his burden to establish anything suggesting that this was not a good faith prosecution or was not instituted with reasonable cause, or was not well-grounded and was brought to embarrass the defendant.

Accordingly, no hearing is required, and defendant's application for an award of attorney's fees and related costs and expenses is denied.