**UNITED STATES of America,**

v.

**James M. KNOTT, Sr., and Riverdale Mills Corporation, Defendants.**

**No. CRIM. A. 98–40022–NMG.**

United States District Court,
D. Massachusetts.

July 27, 2000.

Warren G. Miller, Boston, MA, Henry T. Dunbar, Weymouth, MA, Jamy B. Buchanan, Boston, MA, for Defendants.

William P. Stimson, Jeanne M. Kempthorne, U.S. Atty's Office, Boston, MA, Peter E. Papps, Clyde R.W. Garrigan, Office of U.S. Atty., Concord, NH, Patty Merkamp Stemler, Washington, DC, Steven P. Solow, David M. Uhlmann, Dept. of Justice, Environmental Crime Section, Washington, DC, for U.S.

### MEMORANDUM & ORDER

GORTON, District Judge.

The motion before this Court arises out of the United States' prosecution of James M. Knott, Sr. ("Knott") and Riverdale Mills Corporation ("RMC") for violating, *inter alia*, 33 U.S.C. § 1319(c)(2)(A), the Clean Water Act, by knowingly discharging industrial wastewater with a pH of less than 5.0 standard units ("S.U.") into a publicly-owned wastewater treatment works, i.e. a public sewer.

Knott and RMC allege that the prosecution of those charges by the United States was vexatious, frivolous and in bad faith and seek to have this Court assess attorneys' fees and expenses incurred in their defense pursuant to Public Law No. 105–109, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes) ("the Hyde Amendment") (Docket No. 51). Defendants also seek leave to conduct discovery to support their Hyde Amendment application (Docket No. 70).

### I. Background

RMC manufactures plastic-coated steel wire mesh at a manufacturing facility in Northbridge, Massachusetts. Knott is the controlling shareholder, a director and an officer of RMC and directs its daily operations. RMC's manufacturing process includes two production lines that produce wastewater ultimately discharged into a publicly-owned wastewater treatment works ("the public sewer").

The discharge from the two lines neutralize each other when they are mixed in RMC's wastewater treatment facility and in the pipes that lead from that facility through the plant to a privately owned test pit ("Manhole # 1"). From that pit, the wastewater flows through a privately-owned sewer line under Riverdale Street to an outlet in the public sewer at which point there is a manhole ("Manhole # 2") from which samples may be obtained.

On October 21, 1997, officials from the United States Environmental Protection Agency ("EPA"), acting on an anonymous tip from an RMC employee that RMC's wastewater treatment system was not in operation, arrived at the RMC facility to make an unannounced inspection ("the October inspection"). They asked Knott's permission to inspect the facility and Knott acquiesced, on the condition that the EPA officials be accompanied by RMC representatives during the entire course of their inspection.

Knott directed the inspectors to Manhole # 1 and in the presence of Knott, the inspectors took a sample which yielded a pH of 12.36 S.U. Thereafter, they took a sample yielding a pH of about 2.2 S.U.

Discharge of wastewater below pH 5.0 S.U. into a publicly owned sewer system is prohibited under the Clean Water Act ("CWA"). *See* 40 C.F.R. § 403.5. The group then embarked on a tour of the facility, during which the EPA officers discovered that the wastewater treatment facility at RMC was not in operation. Apparently, the two wastewater streams were not being mixed in the treatment facility as intended because a valve was turned to the wrong position.

Later that afternoon, outside the presence of RMC personnel, the inspectors reopened Manhole # 1 and took additional samples yielding pH readings ranging from 2.19 S.U. to 7.48 S.U. Because RMC personnel were not present during the afternoon sampling activity, in violation of the prior agreement between Knott and the inspectors, the results of those sample takings were later suppressed by this Court. The EPA also took three samples at Manhole # 2. One was recorded as having a pH lower than the applicable standard (4.0 S.U.) but the defendants offered persuasive evidence that the particular recorded entry for that sample had been altered from its actual reading of 7.0 S.U.

Pursuant to a search warrant, EPA law enforcement officials conducted another inspection of the RMC premises on November 7, 1997 ("the November search"). The underlying affidavit in the application for the search warrant recited, *inter alia*, the sampling activity from the October inspection as probable cause for the warrant, although that evidence was later suppressed by this Court.[1] A large number of samples were taken at Manhole # 1 (on private property). Most had a pH below 5.0 S.U. and they worsened as the day progressed. EPA officials took seven samples at Manhole # 2 (on public property) and all had pH readings of 5.0 or 6.0

S.U., within the legal limit under the CWA.

A second search warrant (and third inspection) was executed at RMC on July 17, 1998 in response to Knott's intervening claims that (1) because he owned the property between Manhole # 1 and Manhole # 2, the discharge from the RMC plant did not enter the public sewer system until Manhole # 2, located 300 feet beyond Manhole # 1, and (2) the infiltration of groundwater into the sewer lines between Manholes # 1 and # 2 would (and did) dilute the facility's waste and raise the pH levels to within authorized limits by the time it reached Manhole # 2.

On August 12, 1998, a Grand Jury returned an Indictment charging defendants Knott and RMC in two counts with having violated the CWA by knowingly discharging industrial wastewater with a pH of less than 5.0 S.U. into a publicly-owned treatment works. On February 16, 1999, this Court suppressed the sampling results obtained during the afternoon of the October inspection, finding that the EPA exceeded the scope of Knott's consent when it sampled the wastewater stream without a RMC representative present. The government sought leave of court to dismiss the indictment without prejudice on April 23, 1999 because in the course of preparing for trial, it determined that the evidence was insufficient to sustain its burden of proof. Leave of court to dismiss the indictment without prejudice was granted by this Court on May 6, 1999.

## II. Discussion

The Hyde Amendment, the statute under which defendants seek attorneys' fees and expenses, was enacted as part of a 1997 appropriations bill and is found as a statutory note to 18 U.S.C. § 3006A. It provides as follows:

During fiscal year 1998 and in any fiscal year thereafter, the court, in any crimi-

---

1. Although the suppressed evidence from the October inspection provided the basis for subsequent searches, this Court did not suppress evidence obtained in those later searches because it applied the "good faith" exception to the exclusionary rule.

nal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) pending on or after the date of the enactment of this Act [November 26, 1997], may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of title 28, United States Code [the Equal Access to Justice Act]....

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, Pub.L. No. 105–119, § 617, 111 Stat. 2519. The Hyde Amendment was patterned after the Equal Access to Justice Act, ("EAJA"), 28 U.S.C. § 2412, which provides for an award of attorneys' fees in the civil context.

Defendants argue that their prosecution was vexatious, frivolous and in bad faith because there was never any credible evidence to support the charges of the indictment. The government contends that although its evidence was insufficient to proceed to trial after much of the sampling evidence was lost on a motion to suppress, there was substantial evidence supporting the charges.

## A. Prerequisites for an Award Under the Hyde Amendment

### 1. "Prevailing Party"

■ To recover attorneys' fees under the Hyde Amendment, a criminal defendant first must be a "prevailing party." The Hyde Amendment does not, however, define that term. The government argues that defendants are not "prevailing parties" for Hyde Amendment purposes because the Government voluntarily moved to dismiss the Indictment without preju-

dice prior to trial. It offers the following reasons why a dismissal without prejudice does not render the defendants "prevailing parties":

(1) there is no bar to its obtaining a new indictment charging exactly the same offenses,

(2) a voluntary dismissal without prejudice may rest on any number of factors, the vast majority of which have nothing to do with the defendants' guilt or innocence or whether the government acted improperly,

(3) the determination that a defendant is a prevailing party based upon a voluntary dismissal may be an incentive for prosecutors not to dismiss cases, and

(4) the Court would have to conduct a "minitrial" for each dismissal without prejudice to consider the prosecutor's motives, wasting judicial resources, intruding on the Government's deliberative process and infringing on separation of powers.

Those reasons were rejected by the court in *United States v. Gardner*, 23 F.Supp.2d 1283, 1289–90 (N.D.Okla.1998), when it determined that the government's voluntary dismissal of the charges against a defendant made him a "prevailing party" under the Hyde Amendment. Here, this Court finds that defendants are "prevailing parties" for Hyde Amendment purposes.

### 2. "Procedures and Limitations" of 28 U.S.C. § 2412

The Hyde Amendment expressly directs that awards of fees:

shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under § 2412 of [the EAJA].

Section 2412 of the EAJA provides for the award of attorneys' fees in two separate subsections. Subsection 2412(b) provides that:

[A] court may award reasonable fees and expenses of attorneys in addition to

[costs] to the prevailing party in any civil action brought by or against the United States.... The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

The EAJA does not otherwise restrict awards under § 2412(b). Subsection 2412(d) provides that:

[A] court shall award [fees and expenses] to a prevailing party ... unless the court finds that the position of the United States was substantially justified.

Unlike awards under § 2412(b), awards under § 2412(d) are subject to certain limitations. An individual may not recover attorneys' fees under subsection (d) if his net worth exceeds $2,000,000 and a corporation may not recover fees if its net worth exceeds $7,000,000 and it had more than 500 employees at the time the action was filed. 28 U.S.C. § 2412(d)(1)(C)(2)(B). In addition, the hourly rate for which an award recipient may recover is capped at $125 per hour. 28 U.S.C. § 2412(d)(1)(C)(2)(A). Here, Knott concedes that he would be ineligible under the $2,000,000 net worth limitation. RMC would not be barred, however, because its net worth does not exceed $7,000,000 and it has never had more than 500 employees.

■ Knott argues that he is not subject to the net worth limitation or the cap on fees because defendants may elect to proceed under either 28 U.S.C. § 2412(b) or (d). No Circuit Court of Appeals has yet construed the Hyde Amendment's incorporation of the procedures and limitations of the EAJA and the district courts which have addressed this issue are split. Some conclude that the procedures and limitations of the EAJA are contained in § 2412(d). *See United States v. Peterson,* 71 F.Supp.2d 695, 698 (S.D.Tex.1999); *Gardner* at 1289. Another district court has held that the procedural limitations set forth in § 2412(d) are not applicable if the prevailing party chooses to seek attorneys' fees under § 2412(b). *See United States v. Holland,* 34 F.Supp.2d 346, 358 (E.D.Va. 1999), vacated in part on other grounds by *U.S. v. Holland,* 48 F.Supp.2d 571 (E.D.Va.1999).

This Court is persuaded that the cases holding that the procedures and limitations of § 2412(d) apply to Hyde Amendment applications are better reasoned and adopts the reasoning of the district court in *United States v. Peterson, supra,* which found that the limitations of § 2412(d) apply to applications made under the Hyde Amendment.

The Court does so for three reasons. First, to allow a Hyde Amendment fee applicant to proceed under either subsection would require the court either 1) to ignore and read out of § 2412(b) the clause "under the terms of any statute ...," or 2) to ignore and read out of the Hyde Amendment its express adoption of the procedures and limitations of § 2412, in contravention of its plain statutory language. *Peterson* at 699.

Second, the Hyde Amendment was enacted in order to "incorporate the EAJA into the criminal context to the extent applicable." *Id.* (quotation omitted). If this Court adopted Knott's view of the Hyde Amendment, however, every litigant would choose to proceed only under § 2412(b), thereby avoiding all limitations of § 2412. *Id.*

Third, waivers of sovereign immunity are to be narrowly construed and the award of legal fees is such a waiver. *See Gardner* at 1297 n. 24.

Because this Court concludes that the procedures and limitations of § 2412(d) apply to defendants' fee application, Knott, whose net worth exceeds $2,000,000, is ineligible for an award. This Court is unpersuaded by the government's argument that RMC is an alter ego of Knott and finds that RMC is not similarly barred by the limitations of § 2412(d) but rather, is eligible for an award of fees.

## B. "Vexatious, Frivolous or In Bad Faith"

■ Whereas the government must prove that its position was substantially justified when faced with a motion for attorneys' fees under the EAJA, under the Hyde Amendment, the movant seeking an award of attorneys' fees must show more. *See United States v. Truesdale,* 211 F.3d 898, 909 (5th Cir.2000). A Hyde Amendment applicant has the burden of proving, by a preponderance of the evidence, that the government's position was "vexatious, frivolous *or* in bad faith (emphasis supplied)." Because those words are not defined in the statute, they "must be given their ordinary meaning." *United States v. Gilbert,* 198 F.3d 1293, 1298 (1999), quoting *Chapman v. United States,* 500 U.S. 453, 462, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

"Vexatious" means "without reasonable or probable cause or excuse." Black's Law Dictionary 1565 (6th Ed.1990). A charge is "vexatious" if it is calculated to "harass, disquiet or annoy." *Id.* A "frivolous action" is one that is "[g]roundless ... with little prospect of success; often brought to embarrass or annoy the defendant." *Black's Law Dictionary* 668 (6th Ed.1990). "Bad faith" is not simply bad judgment or negligence, but rather it "implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; ... it contemplates a state of mind affirmatively operating with furtive design or ill will." Black's Law Dictionary 139 (6th Ed.1990). *Gilbert* at 1303.

Courts have awarded fees under the Hyde Amendment when the prosecution "clearly violated the law or pursued baseless charges unjustifiably." *United States v. Pritt,* 77 F.Supp.2d 743, 748 (S.D.W.Va. 1999). In other words, the defendant must show that the government's legal position was asserted "in bad faith or without any foundation or basis for belief that it might prevail." *Gilbert* at 1303. A Hyde Amendment applicant must show that the government's position underlying the pros-ecution amounts to prosecutorial misconduct. *Gilbert* at 1299.

■ Here, defendants were prosecuted for violating the Clean Water Act by discharging waste with a pH of less than 5.0 S.U. into the public sewer. The government did not, however, have any credible evidence to support that accusation. To the contrary, the samples taken at Manhole # 2, the point of discharge into the public sewer, showed that RMC was *not* in violation of the Clean Water Act.

Further, the EPA's collection of evidence in support of the government's charges is suspect. At the October inspection, the EPA ignored the clear condition that Knott imposed upon his consent for the inspection of RMC's facilities and surreptitiously obtained samples in the absence of RMC personnel. Defendants presented credible evidence that recorded sample readings were altered by someone. Apparently, several recorded readings in the pH "7" range taken at both Manholes # 1 and # 2 were altered to look like readings in the "2" and "4" ranges.

During the October inspection, Knott informed the EPA agents that he owned Riverdale Street. In later applying for a search warrant, an EPA official acknowledged that if RMC owned the sewer under Riverdale Street "the discharge might not enter the town sewer system until it reaches the main sewer connection [Manhole # 2]." That indicates that the EPA was aware of Knott's ownership claim.

Furthermore, counsel for defendants told the government on November 18, 1997 that RMC's wastewater streams were neutralized before reaching the public sewer. At the very least, the government was aware, on December 19, 1997, when Knott escorted government agents on a tour of the RMC facility, of his claimed ownership of Manhole # 1, the sewer line running to Manhole # 2 and Riverdale Street. Moreover, Knott followed up by sending documentation to the prosecutor confirming

that he owned that property as he had represented.

The government knew, or should have known, that RMC's discharge did not enter the public sewer until it reached Manhole # 2, yet for unexplained reasons, the government failed to take further samples there. There were no obstacles to its doing so because Manhole # 2 is on public property, leaving the impression, at least, that the government took no more samples at Manhole # 2 because it had no reasonable expectation of discovering a violation of the CWA by doing so.

Instead, in the absence of evidence of an illegal wastewater discharge into the public sewer at Manhole # 2, the government persisted in the presentation of evidence to the Grand Jury. The defendants' humiliation at being criminally prosecuted was intensified when the United States Attorney and the EPA issued a Press Release following the indictment which stated that RMC and Knott were knowingly polluting the rivers of the Commonwealth.

A small number of samples which had been obtained at Manhole # 1 indicated that RMC was not discharging wastewater in violation of the applicable limit. The government failed, however, to produce a laboratory log from the November search revealing that exculpatory information as part of its automatic discovery disclosures on September 14, 1998. Instead, it stated that "The United States is unaware of the existence of any exculpatory evidence." The government provided the exculpatory evidence only after defendants specifically requested the log.

This Court is also troubled by the government's unnecessary harassment of defendants and their employees during the November search. At that time, a virtual "SWAT team" consisting of twenty-one EPA law enforcement officers and agents, many of whom were armed, stormed the RMC facility to conduct pH samplings. They vigorously interrogated and video-taped employees causing them great distress and discomfort.

After consideration of the conduct of the EPA personnel and the government in connection with this case, this Court finds that the United States' prosecution of defendants, although not provably frivolous or in bad faith, was clearly vexatious. Knott is barred from recovering attorneys' fees by the net worth limitation of 28 U.S.C. § 2412(d), but RMC is entitled to an award of attorneys' fees under the Hyde Amendment. Additional discovery in support of defendants' application for attorneys' fees is therefore unnecessary.

## C. Calculation of Fee Award

Pursuant to 28 U.S.C. § 2412(d)(2)(A)(ii), recovery of attorneys' fees is capped at $125 per hour. RMC has not shown that the three attorneys it retained were "qualified" in some "specialized sense" or that they had some "specialized skill needful for the litigation in question" as required to be reimbursed at a higher rate. Further, because Knott does not satisfy the net-worth limitation of § 2412(d)(2)(B)(i) and is not, therefore, entitled to an award of attorneys' fees, the amount requested for the joint representation of Knott and RMC will be reduced accordingly. The number of hours incurred by each of the defendants' attorneys will be reduced by one-half and the resulting total hours will be reimbursed at the statutory rate of $125. Attorneys' costs will be similarly reduced.

Knott, on behalf of RMC, requests reimbursement for litigation expenses, exclusive of attorneys' fees and expenses, as follows:

| | | |
|---|---|---|
| (1) | expert witness fees | $ 6,998.69 |
| (2) | costs of tests and studies | 30,110.50 |
| (3) | private investigator fees | 500.90 |
| (4) | copying expense | 223.17 |
| (5) | costs of a projector and tape recorder | 4,708.85 |
| (6) | miscellaneous expense | 895.12 |
| (7) | automobile expense | 729.78 |

(8) cost of service of witness subpoenas    244.00

(9) fees paid to a public relations firm    2,520.93

TOTAL:    $46,931.94 [2]

■ RMC is entitled to reimbursement for costs associated with expert witnesses, tests and studies, copying, transportation and service of witness subpoenas but it will not be reimbursed for its expenditures for a private investigator or for public relations services. Reimbursement for the cost of a projector and a tape recorder may be appropriate if it were a necessary rental expense, but because RMC fails to specify whether that equipment was rented or purchased or exactly what the equipment was used for, RMC will not be reimbursed for that expenditure. Moreover, "miscellaneous expenses" will not be reimbursed because no detail is provided. Because the allowed litigation expenses were incurred partially in Knott's defense, they will be reduced by one-half and RMC will be reimbursed for litigation expenses in the amount of $19,153.07.

Thus, the Court finds that RMC is entitled to an award of attorneys' fees and expenses as follows:

Attorneys' Fees:

| | | |
|---|---|---|
| Jamy B. Buchanan | (245.5 hours ÷ 2 × $125): | $ 15,343.75 |
| Henry T. Dunker [3] | (159.9 hours ÷ 2 × $125): | $ 9,993.75 |
| Warren G. Miller | (341.1 hours ÷ 2 × $125): | $ 21,318.75 |
| | | $ 46,656.25 |

Attorneys' Costs:

| | | |
|---|---|---|
| Jamy B. Buchanan | ($5,564.63 ÷ 2): | $ 2,782.31 |
| Henry T. Dunker | ($104.42 ÷ 2): | $ 52.21 |
| Warren G. Miller | ($164.31 ÷ 2): | $ 82.16 |
| | | $ 2,916.68 |

Litigation Expenses: (see summary above)    $ 19,153.07

TOTAL:    $ 68,726.00

## ORDER

For the foregoing reasons, with respect to RMC's request for an award of attorneys' fees and expenses, defendants' motion for attorneys' fees (Docket No. 51) is hereby ALLOWED. The United States shall reimburse RMC for attorneys' fees and expenses in the amount of $ 68,726.00 as more fully set forth in the Memorandum above. Defendants' motion for leave to conduct discovery and request for oral argument (Docket No. 70) is hereby DENIED, as moot.

So ordered.

■

2. Knott submitted Schedule A to his Affidavit with a modest mathematical error. The total of the submitted expenses, is $46,931.94, not $46,631.94 as claimed.

3. Henry Dunker's Affidavit also contains a mathematical error. He claims that he billed defendants $25,564 for legal services. The itemizations attached to his Affidavit show, however, that he charged $25,584.