# United States Court of Appeals
## For the First Circuit

No. 04-1626

RIVERDALE MILLS CORP. and JAMES M. KNOTT, SR.,

Plaintiffs, Appellees,

v.

JUSTIN PIMPARE and DANIEL GRANZ,

Defendants, Appellants,

UNITED STATES; THREE UNKNOWN NAMED AGENTS OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY; and STEPHEN CREAVIN,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Circuit Judge
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Jeffrey S. Bucholtz, Deputy Assistant Attorney General, with whom Peter D. Keisler, Assistant Attorney General, Michael J. Sullivan, United States Attorney, Barbara L. Herwig, Attorney, Appellate Staff, Civil Division, Department of Justice, and Richard A. Olderman, Attorney, Appellate Staff, Civil Division, Department of Justice, were on brief, for appellants.
Paul D. Kamenar, with whom Warren G. Miller, Henry T. Dunker, Daniel J. Popeo, and the Washington Legal Foundation were on brief, for appellees.

December 22, 2004

**LYNCH**, **Circuit Judge**.  This case involves another episode in the ongoing saga of disputes between the owner of a mill and the United States Environmental Protection Agency (EPA).  An earlier episode is recounted in United States v. Knott, 256 F.3d 20 (1st Cir. 2001).  This episode involves issues of qualified immunity for EPA inspectors who took wastewater samples.

James M. Knott, Sr., and Riverdale Mills Corporation ("Riverdale") sued two EPA inspectors, Justin Pimpare and Daniel Granz, alleging violations of the plaintiffs' Fourth Amendment right to be free from unreasonable searches.[1]  The plaintiffs allege that the agents' sampling, without warrant or consent, of wastewater from underneath a manhole located on Riverdale land in Northbridge, Massachusetts, on the afternoon of October 21, 1997, constituted a violation of the Fourth Amendment.  The Fourth Amendment claim is pursuant to Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

Pimpare and Granz defended, inter alia, on grounds of qualified immunity; the district court denied their motion for summary judgment on grounds of qualified immunity, and they properly filed an interlocutory appeal.  We reverse because, under the first prong of the qualified immunity test, Knott and Riverdale

---

[1]Riverdale also sued a third EPA agent, Stephen Creavin: the district court granted Creavin qualified immunity. Riverdale Mills Corp. v. United States, 337 F. Supp. 2d 247, 255-57 (D. Mass. 2004).  The plaintiffs do not appeal this determination.

have no reasonable expectation of privacy in this wastewater under the circumstances shown in the record and therefore they have no Fourth Amendment right. Even were this ruling incorrect, we would reverse under the second prong, since the existence of such a reasonable expectation was not clearly established law. We remand for entry of judgment for Pimpare and Granz on qualified immunity grounds.

## I.

Riverdale manufactures plastic-coated steel wire products. Knott is the company's president, treasurer, chief executive officer, chairman of the board, and controlling shareholder. During manufacture of the product, a water-based cleaning process is used, and this cleaning process generates both acidic and alkaline wastewater. Riverdale has a state permit allowing it to put this wastewater into the public sewer system so long as proper treatment (neutralizing the acidic or alkaline qualities of the water, among other things) has been applied before the wastewater reaches the public sewer.

In order to meet state and federal clean-water requirements, Riverdale has a pretreatment system within its plant which is supposed to treat and neutralize the acid or base qualities of the wastewater before it reaches the public sewer. After going through the pretreatment system, the wastewater flows through a meter loop where the quantity of wastewater is measured

to determine the sewer charges that Riverdale must pay to the town of Northbridge. The wastewater then flows through a "test pit" outside of Riverdale's plant ("Manhole 1") toward the public sewer.[2]

Manhole 1 is roughly two feet deep and is covered by an unmarked 171-pound steel manhole cover. It is located on a paved street, Riverdale Street, that runs alongside the mill building. Pimpare noted in his affidavit that it "appears to be a public street." Riverdale alleges that it privately owns this street, which runs from a public road (Route 122) across Riverdale's property along the northern side of the mill. The road dead ends, however, at a set of concrete barriers before a bridge on Riverdale's property. On the Route 122 entrance to Riverdale Street, a sign reads "Bridge Closed -- Local Traffic Only." The road is actually on top of an earthen dam built by earlier owners of the plant and used to create a millpond opposite the Riverdale mill. Riverdale has alleged in its complaint that Riverdale owns Manhole 1; there is, as we found in a previous opinion, considerable reasonable dispute about whether this is so. See Knott, 256 F.3d at 32. However, since the case is before us at the

---

[2]Manhole 1 is referred to as a "test pit" by both sides. There is evidence that Knott allowed regulators to test there in the past. A September 8, 1987 letter from Knott to the Chairman of the Town of Northbridge Board of Sewer Commissioners refers to a "pit" that is apparently Manhole 1 and states that "[t]his pit should be all that is needed to do whatever the Sewer Department might ever need to do with respect" to Riverdale's wastewater discharge.

summary judgment stage, we must construe all disputed facts in the record in favor of the non-movants, and thus, we treat the road as privately owned by Riverdale.

The plant's wastewater flows past Manhole 1 through 300 more feet of pipe allegedly owned by Riverdale to Manhole 2, which is further down Riverdale Street. At Manhole 2, the Riverdale pipe carrying wastewater from Manhole 1 enters Manhole 2 as a separate flow and merges with other flows within Manhole 2 (it is possible to sample Riverdale's wastewater separately at Manhole 2 before it merges with the other flows). Manhole 2 is indisputably publicly owned and is part of the public sewer system. From there, the wastewater eventually flows to the Town of Northbridge treatment plant before being released into the Blackstone River.

On July 28, 1997, an anonymous tipster purporting to be a Riverdale employee sent a letter to the EPA alleging that the plant's pretreatment system was not being run properly and thus that the plant might be discharging wastewater with improper pH levels and other problems.

The EPA decided to look into it. On the morning of October, 21, 1997, the Agency sent Pimpare and Granz to the mill to perform an inspection. The two inspectors did not obtain a search warrant, and there is no claim of exigent circumstances. Inspector Pimpare first met with Knott and two high-level employees; Inspector Granz arrived sometime during that opening meeting. At

-5-

that meeting, Pimpare did not assert any statutory authority to search Riverdale property but instead asked Knott to give his consent to an inspection of the wastewater treatment facility, including tests of the wastewater.

Both the complaint and Knott's affidavit state that Knott "explicitly" told both Pimpare and Granz that they could sample Riverdale's wastewater and tour its plant only on the "express condition" that they be accompanied at all times by Knott or Riverdale employees designated by Knott. We accept the district court's conclusion that Knott's consent was given only on condition that the agents be so accompanied at all times.[3] See Knott, 256 F.3d at 23. At some point during the day, Knott also told the inspectors that he owned the sewer lines under Manhole 1 and that the public sewer did not begin until Manhole 2. Knott told the inspectors this at a closing conference after all the sampling from Manhole 1 had already been completed. Id. at 24. Knott alleges that he also told the agents this fact at the opening meeting, before any sampling was done.

That morning, right after the meeting, Pimpare and Granz were taken by Knott and the two Riverdale employees directly to Manhole 1, where the inspectors took samples from approximately

---

[3]The agents' brief concedes that Knott imposed this condition. Pimpare stated in an affidavit, however, that he understood Knott merely to be indicating that Knott and the Riverdale employees would "walk [Pimpare and Granz] around the premises," not that they needed to be present for any inspecting to occur.

10:40 am to 11:15 am. One sample was provided to a Riverdale employee. This first sampling, then, was indisputably in conformity with Fourth Amendment requirements, if any are applicable, because it fell within the scope of consent.

The inspectors had earlier planned on setting up a 24-hour composite sample, but this was not done. The reason why this was not done is in some dispute. Pimpare's affidavit states that it was infeasible because of the intermittent nature of the wastewater discharges. He states that he told Knott this and "made it clear to Knott that Granz and [Pimpare] would be taking additional samples from the manhole throughout the day." He says that Knott responded, "Okay." Knott gives a different account. His affidavit states that Pimpare told him 24-hour composite sampling would be a bad idea because it would be unsafe to leave the equipment in the street. Knott says he offered the agents some accommodations to fix this problem, which were declined. Knott states that he was never told that the inspectors were going to conduct periodic sampling throughout the day.

After conducting this initial round of sampling at Manhole 1, Pimpare states that he and Granz were taken on a tour of the mill by Knott and the two employees. Pimpare states that at the conclusion of this tour, he again told Knott and the two employees that he would need to conduct more testing at Manhole 1;

-7-

he asserts that Knott did not object.  Knott disputes that Pimpare told him the agents would need to conduct more tests at Manhole 1.

In any event, Pimpare and Granz took samples from Manhole 1 during two additional intervals that afternoon: between 12:40 pm and 1:15 pm, and between 3:00 pm and 3:04 pm.  These sampling events are the crucial ones for purposes of this appeal.  Knott states that Pimpare and Granz took these samples without him or any of his representatives present, and thus that this afternoon sampling exceeded the scope of his consent.  The inspectors concede that no Riverdale representatives were present for this sampling. The sampling occurred, however, on the street in front of the plant and in full view of Riverdale employees.  Id. at 23.  A sample from the 12:40 pm to 1:15 pm testing was given to one of the Riverdale employees, who signed a chain of custody form.  Id. at 24.  Before leaving the area that day, the inspectors also took samples from Manhole 2.

The data resulting from the October 21 sampling led the EPA to obtain an administrative search warrant and to search the facility pursuant to this warrant on November 7, 1997.  A second, criminal search warrant was executed on July 19, 1998.  These later searches are not at issue in this appeal; only the October 21, 1997 afternoon sampling is relevant.

**II.**

Riverdale and Knott were indicted by a grand jury on August 12, 1998, based on evidence found in these searches, for two counts of violating the Clean Water Act, 33 U.S.C. § 1251 et seq., by discharging industrial waste into publicly owned treatment works in violation of a national pretreatment standard for pH levels. See 33 U.S.C. §§ 1317(b)(1), 1319(c)(2)(A); 40 C.F.R. § 403.5(b)(2). Knott and Riverdale moved to suppress evidence obtained during the October 21, 1997 and November 7, 1997 searches. The district court granted the motion in part: it determined that the afternoon sampling on October 21 had exceeded the scope of Knott's consent because neither Knott nor a designated Riverdale employee had been present. It thus suppressed the fruits of those afternoon searches but declined to suppress any evidence obtained on November 7. Knott, 256 F.3d at 25. The government sought leave of court to dismiss the indictment without prejudice on April 23, 1999, and such leave was granted on May 6, 1999. Id.

The district court then granted a motion by Riverdale to recover reasonable attorneys' fees under the Hyde Amendment on the grounds that the prosecution against it had been vexatious. United States v. Knott, 106 F. Supp. 174, 179-80 (D. Mass. 2000). This court reversed. Knott, 256 F.3d at 36. In the course of conducting our inquiry, we noted that although the district court's order suppressing the results of the October 21 search was not

before us, the "issue was close" because of the "factual disputes" surrounding the events of October 21 and the "at the very least . . . ambiguous" nature of the conditions imposed on Knott's consent to the sampling. Id. at 31, 35-36. We also noted that even if the inspectors exceeded the scope of their permission, this "could just as well have rested on an honest mistake of fact or misapprehension of the authority they had been granted," an interpretation supported by the fact that the inspectors provided a Riverdale employee with a sample of the afternoon's testing. Id. at 31.

Knott and Riverdale then brought this civil action in federal district court for damages, based on alleged constitutional violations, against the United States, Pimpare, Granz, and another EPA agent, Stephen Creavin. On March 16, 2004, the district court denied Pimpare's and Granz's motions for summary judgment on the grounds of qualified immunity. Riverdale Mills Corp. v. United States, 337 F. Supp. 2d 247, 254-55 (D. Mass. 2004). The court correctly articulated the three-part test for qualified immunity (which we discuss later), looking first at whether the facts viewed most favorably to the plaintiff allege the violation of a constitutional right; second whether the constitutional right allegedly violated was clearly established; and third whether the defendants nonetheless deserve qualified immunity because their

-10-

actions were objectively reasonable.  See Abreu-Guzman v. Ford, 241

F.3d 69, 73 (1st Cir. 2001).[4]

On the first prong of the test, the district court held

that Riverdale's allegation that Pimpare and Granz exceeded the

scope of Knott's consent to the October 21 search of wastewater in

Manhole 1, if true, constituted a violation of Riverdale's Fourth

Amendment rights.  Riverdale Mills Corp., 337 F. Supp. 2d at 255.

The court found defendants' attempted analogy between wastewater

and trash left on the curbside for public-waste disposal (which

receives no Fourth Amendment protection because there is no

reasonable expectation of privacy) to be unpersuasive.  Id.  On the

second prong, whether the law constituting the constitutional

violation was clearly established, the court simply noted that

"there can be no doubt that the law regarding the necessity for a

search warrant is clear."  Id.  Finally, on the third prong, the

court held that a reasonable officer would have understood that he

was exceeding the scope of Knott's consent.  Id.  The court also

---

[4]In the same opinion, the district court granted Creavin, who did not conduct sampling on October 21, qualified immunity on the grounds that he did not violate Riverdale or Knott's Fourth or Fifth Amendment rights.  Riverdale Mills Corp., 337 F. Supp. 2d at 255-57.  Knott and Riverdale have not appealed this determination. The court also allowed a Federal Tort Claims Act claim against the United States, on the basis of malicious prosecution, to survive summary judgment.  Id. at 252-54.  This claim is also not before us.  On November 1, 2004, after a bench trial, the district court issued an opinion and filed judgment for the United States on the malicious prosecution claim.  Riverdale Mills Corp. v. United States, Civ. A. No. 00-40137-NMG, 2004 WL 2711300 (D. Mass. November 1, 2004).

noted that a reasonable officer would have known that in the absence of consent, a warrant was necessary to sample the wastewater at Manhole 1. The court stated this was shown by the fact that the agents sought consent in the first place on October 21 and that they obtained a warrant before searching again on November 7. Id. Granz and Pimpare filed a timely interlocutory appeal of this denial of qualified immunity.

**III.**

We have jurisdiction over an interlocutory appeal from a denial of qualified immunity, where, as here, the denial rests on purely legal questions and not on disputed issues of fact. Dwan v. City of Boston, 329 F.3d 275, 278 (1st Cir. 2003). Review is de novo. Id.

Qualified immunity provides "an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Qualified immunity is designed to protect most public officials: "it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

As most recently explained by Justice Breyer in his concurring opinion in Brosseau v. Haugen, the test laid out in Saucier has two basic parts: "Saucier requires lower courts to decide (1) the constitutional question prior to deciding (2) the

-12-

qualified immunity question." No. 03-1261, 2004 WL 2847251, at *5 (Dec. 13, 2004) (Breyer, J., concurring). This Circuit has usually explained qualified immunity as a three-stage test by subdividing Saucier's second stage into two distinct questions.[5] See Abreu-Guzman, 241 F.3d at 73. The three-part test asks first: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201. As to the second prong, we have asked "whether the right was clearly established at the time of the alleged violation" such that a reasonable officer would "be on notice that [his] conduct [was] unlawful." Suboh v. Dist. Attorney's Office, 298 F.3d 81, 90 (1st Cir. 2002).

On the third prong, we ask whether a "reasonable officer, similarly situated, would understand that the challenged conduct violated" the clearly established right at issue. Id. It is not always evident at the time an official takes an action that a clearly established right is involved. For example, the factual situation might be ambiguous or the application of the legal standard to the precise facts at issue might be difficult; in either case the officer's actions may be objectively reasonable and she may be entitled to qualified immunity. See Saucier, 533 U.S. at 205; Suboh, 298 F.3d at 95-97. In this last stage we consider

---

[5]However, the second and third prongs have occasionally been combined into one step in this circuit. See Tremblay v. McClellan, 350 F.3d 195, 199-200 (1st Cir. 2003).

any material facts as long as they are undisputed.  See Suboh, 298 F.3d at 90.

The First Prong

The Supreme Court has stated that courts should begin with the first prong, that is, whether the facts as seen in the light most favorable to the injured party show that the officers' conduct violated a constitutional right.  See Saucier, 533 U.S. at 201; see also Bellville v. Town of Northboro, 375 F.3d 25, 30 (1st Cir. 2004).  This first step is meant to aid in the "law's elaboration from case to case."  Saucier, 533 U.S. at 201.

The issue of how specific the first prong is meant to be is an issue that has troubled courts for some time.  See Tremblay v. McClellan, 350 F.3d 195, 199-200 (1st Cir. 2003); DiMeglio v. Haines, 45 F.3d 790, 795-97 (4th Cir. 1995) (explaining different types of inquiries that courts have performed at the first prong, although ultimately concluding -- pre-Saucier -- that this prong need not be decided first).

The level of specificity depends on the stage of the proceedings at which a qualified immunity defense is brought.  A qualified immunity defense can, of course, be brought as a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim upon which relief can be granted.  In such a case the entire qualified immunity analysis, including the first prong, must be based only on the facts stated in the complaint itself.  See, e.g., Butler v. San

-14-

Diego Dist. Attorney's Office, 370 F.3d 956, 963-64 (9th Cir. 2004). At the 12(b)(6) stage, the question on the first prong is whether, using all of the well-pleaded facts stated in the complaint and viewing them in the light most favorable to the plaintiff, the plaintiff has stated a claim for a violation of some constitutional right. The first prong inquiry at this 12(b)(6) stage is unlikely to be very specific, given that federal civil practice is based on notice pleading, where great specificity is not required, Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004), and that there is no heightened pleading requirement for civil rights cases, Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993); Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 67-68 (1st Cir. 2004).

Where, as here, qualified immunity is brought at the summary judgment stage, the inquiry on the first prong is somewhat different. The language in Saucier is ambiguous on this point; the case refers both to "the facts alleged" and to the "parties' submissions." 533 U.S. at 201. But subsequent Supreme Court cases have clarified, implicitly if not explicitly, that courts assessing the first prong at summary judgment should look beyond the complaint to the broader summary judgment record. See Groh v. Ramirez, 124 S. Ct. 1284, 1293 (2004) (noting on the first prong defendants' version of a statement made to the plaintiffs, but

-15-

pointing out that one plaintiff had filed an affidavit contesting this account, and concluding that the summary judgment "posture of the case . . . obliges us to credit [plaintiff's] account"); Hope v. Pelzer, 536 U.S. 730, 734 n.1 (2002) (laying out the normal summary judgment test before assessing even the first prong of the qualified immunity test). The first prong inquiry will usually gain specificity at this summary judgment stage because of the ability to determine then whether plaintiff's claim survives in light of all the uncontested facts and any contested facts looked at in the plaintiff's favor, rather than just the allegations that appear on the face of the complaint.

We emphasize that the rule stating that the first prong must be performed before the rest of the qualified immunity analysis is not completely inflexible. The purpose of starting with the first prong is to aid in law elaboration. Saucier itself suggests that this law elaboration function will be well served only in "appropriate cases," 533 U.S. at 207, and we have previously noted that in some cases, such as where the claim depends on a "kaleidoscope of facts not yet fully developed," the law elaboration function is not well served and thus the Saucier rule may not strictly apply. Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69-70 (1st Cir. 2002).[6] Moreover, the level of

---

[6]Indeed, three Supreme Court justices expressed concern in a recent concurrence that a rigid application of the Saucier rule -- that the first prong must be decided before the rest of the

-16-

specificity at which the first prong is analyzed may change depending on a given inquiry's utility in further elaborating the law.

Nonetheless, it is clear that when performing the first prong of the analysis, it is generally inadequate to state a very generalized proposition such as whether it is a constitutional violation for enforcement officers to perform an unreasonable search. See Int'l Action Ctr. v. United States, 365 F.3d 20, 25 (D.C. Cir. 2004) ("It does no good to allege [on the first prong] that police officers violated the right to free speech, and then [on the second prong to] conclude that the right to free speech has been clearly established in this country since 1791."); see also Butera v. Dist. of Columbia, 235 F.3d 637, 646-47 (D.C. Cir. 2001). Such an inquiry does nothing to further elaborate the law.

In this case, Granz and Pimpare have raised the qualified immunity defense on summary judgment and not as a 12(b)(6) motion. We take it as undisputed at this stage that the agents lacked a warrant and that they exceeded the scope of Knott's consent.[7]

_____

qualified immunity inquiry -- was unwise because of its tendency to lead to wasted judicial resources and to constitutional decisions that were insulated from judicial review. These justices thus asked that the rule be reconsidered. See Brosseau, 2004 WL 2847251, at *5 (Breyer, J., concurring). However, the Saucier rule has not been overruled by the Supreme Court.

[7]Pimpare and Granz do not argue that Riverdale is a "pervasively regulated business" that can be searched for this purpose without a warrant. See New York v. Burger, 482 U.S. 691, 699-703 (1987) (discussing the exception to the warrant requirement

-17-

These issues, however, go only to the "reasonableness" of any Fourth Amendment "search."

The threshold issue is whether there was a "search" at all for Fourth Amendment purposes. Granz and Pimpare's actions were only a "search" if Riverdale had a reasonable expectation of privacy in the wastewater underneath Manhole 1. See Kyllo v. United States, 533 U.S. 27, 31-33 (2001); see also Katz v. United States, 389 U.S. 347, 351-52 (1961). Under the Katz doctrine, courts are required to differentiate between the question of whether a search is reasonable and the antecedent question of whether there is a Fourth Amendment "search" at all. The antecedent question turns on, first, whether there is a subjective expectation of privacy, and, second, whether society is willing to recognize that expectation as objectively reasonable. We will assume Riverdale had a subjective expectation of privacy. That still leaves the objective part of the test. We ask whether any subjective expectation of privacy that Riverdale might have had was one which society was willing to accept as objectively reasonable.

The key issue for the first prong, then, is whether Riverdale, based on the undisputed material facts and any disputed material facts looked at in its favor, had an objectively

_____

for inspection of commercial premises in "closely regulated" industries). We do not address this issue. Nonetheless, the commercial context is relevant to the reasonableness of any expectation of privacy.

-18-

reasonable expectation of privacy in the wastewater underneath Manhole 1. More specifically, our inquiry is whether a company has a reasonable expectation of privacy in industrial wastewater that is on a private street and underneath a 171-pound manhole cover but 300 feet away from and flowing irrevocably into the public sewer system.

The EPA inspectors urge that we adopt a per se rule that there is never a reasonable expectation of privacy in wastewater. This we decline to do. Judgments about reasonable expectations of privacy are very fact-specific, and there may be fact situations where wastewater is entitled to constitutional protection. See Dow Chem. Co. v. United States, 476 U.S. 227, 238 n.5 (1986) (reasonable expectation of privacy issues, like most Fourth Amendment issues, "must be decided on the facts of each case, not by extravagant generalizations"); United States v. Burnette, 375 F.3d 10, 16 (1st Cir. 2004). Factual variations might matter here: suppose, for example, the wastewater is from a sewage holding tank attached to a mobile home used as a residence by a sole occupant, and a sample is searched and seized for evidence of drug use. Because, in some situations, people have a reasonable expectation of privacy in their own bodily waste, see, e.g., Skinner v. Ry. Labor Executives Ass'n, 489 U.S. 602, 617 (1989) (chemical analysis of urine sample is a "search" for Fourth Amendment purposes; tested subject has a reasonable expectation of privacy), the character of

-19-

the matter seized (i.e., wastewater) may not prove to be dispositive on the issue of reasonable expectation of privacy.

The trash cases that the agents cite also do not support their per se rule. These cases do not establish that trash can never be protected for Fourth Amendment purposes; rather they hold only that trash left in bags on or near the curb for collection by a third party is unprotected. See, e.g., California v. Greenwood, 486 U.S. 35, 40-42 (1988); United States v. Scott, 975 F.2d 927, 929 (1st Cir. 1992); United States v. Wilkinson, 926 F.2d 22, 27 (1st Cir. 1991).

Whether there is a reasonable expectation of privacy depends on a variety of factors in addition to the character of the substance as wastewater. The commercial context is relevant; this may reduce Riverdale's expectation of privacy somewhat. See Dow Chem. Co., 476 U.S. at 237-38; United States v. Beaudoin, 362 F.3d 60, 65 (1st Cir. 2004).

The fact that Manhole 1 is on private property is relevant, but that fact alone does not resolve the issue one way or the other. The contours of the Fourth Amendment are not coterminous with property and trespass law. See Oliver v. United States, 466 U.S. 170, 183-84 (1984) ("[I]n the case of open fields, the general rights of property protected by the common law of trespass have little or no relevance to the applicability of the Fourth Amendment."); Katz, 389 U.S. at 351. This case does not

involve stationary wastewater in holding lagoons entirely on private property and shielded from public access, in which there may be stronger expectations of privacy. While it is of some support to Riverdale that this wastewater was found on private property, that support is limited. It is also relevant that Manhole 1 was located on a private road; this street is an area of Riverdale property that is most akin to an open field rather than to a more heavily protected type of area, like curtilage or the interior of a home or business. See, e.g., Dow Chem. Co., 476 U.S. at 235-37 (applying the open field and curtilage doctrines that had developed in a residential context to an industrial setting).

Ultimately, we conclude that the controlling fact here is that the wastewater at Manhole 1 is irretrievably flowing into the public sewer, which is only 300 feet away. The wastewater will inevitably reach Manhole 2, where the public sewer begins, after only a short period of time, and once it reaches that point, any member of the public can take a sample. Wastewater at Manhole 1 under these circumstances is similar to trash left out on the curb for pick-up by the trash collector, which enjoys no reasonable expectation of privacy, even if left in opaque bags. See Greenwood, 486 U.S. at 40-41; Scott, 975 F.2d at 928-29; Wilkinson, 926 F.2d at 27. In the case of trash left on the curb, there is no reasonable expectation of privacy both because a passerby can rummage through the trash while on the curb and because the trash

-21-

has been intentionally left outside for a third-party garbage collector, who in the near future will take the trash and be free to examine it. Greenwood, 486 U.S. at 40-41.

It is true that a passerby cannot as easily sample wastewater while it is underneath Manhole 1 as he can pick through garbage. However, because the wastewater will assuredly enter the public sewer and will flow there so quickly, the trash analogy controls even if it is not exact. Plaintiffs make an implicit argument that they should be able to expect privacy up until the point at which their wastewater can no longer be differentiated from the other sewage flows. This argument misfires. Riverdale had no cut-off valve at Manhole 1, and thus no way to stop the irretrievable flow to the public sewer. On these facts, Riverdale has abandoned any reasonable expectation of privacy in the wastewater by allowing it to flow irretrievably into a place where it will be "exposed . . . to the public." Id. at 40.

Riverdale relies heavily -- and incorrectly -- on the Massachusetts Supreme Judicial Court decision in Commonwealth v. Krisco Corp., 653 N.E.2d 579 (Mass. 1995). This case held that a commercial proprietor had a reasonable expectation of privacy in a dumpster located in an adjacent alley that was gated at either end by the owner (thus completely out of sight of passersby) until the trash collector actually arrived. See id. at 584. It is surely relevant for Fourth Amendment purposes whether and to what extent

-22-

someone seeks to "preserve" something as "private" by keeping it away from public scrutiny.  Katz, 389 U.S. at 351.  But Manhole 1 does not play the same role as the gates in Krisco.  The gates in Krisco reasonably told the public to stay out of the area around the dumpster and even left it ignorant as to what was in that area; they represented affirmative steps to exclude the public from the area.

By contrast, a manhole cover is normally intended less to keep people out than to provide them access: the manhole cover, even if heavy, is one of the few points from which an underground sewer can be reached.  Moreover, a manhole cover, unlike a gate or fence, is not intended to leave passersby ignorant as to the contents within.  Fences might hide any number of highly private objects; manholes, however, generally give access only to a few sorts of things, most commonly a sewer (or underground wires or pipes).  Placing otherwise unprotected wastewater underneath a manhole cover does not create a reasonable expectation of privacy where one did not exist before.  At any rate, the trash in Krisco, which was being held stationary behind the gates for pickup, is quite different than the wastewater here, which is not being held within Manhole 1 but rather is flowing through it on its way to the public sewer.

We hold that based on the summary judgment record and using the normal summary judgment standard, Riverdale's Fourth

Amendment rights were not violated and the agents are entitled to qualified immunity on the first prong. We thus need not reach the other two prongs of the qualified immunity analysis; we address the second prong merely as an alternative ground for decision, should we be wrong on the first prong.

The Second Prong

The second prong asks whether the constitutional right that the officer allegedly violated was "clearly established" at the time of the incident such that it would "be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. The core concern is one of notice to the officers on the particular facts that they faced. See Suboh, 298 F.3d at 90. The Supreme Court has made it quite clear that the second inquiry is a specific one; it is necessary to look at the particular factual context. See Brosseau, 2004 WL 2847251, at *3; Hope, 536 U.S. at 739-41; Saucier, 533 U.S. at 201-02, 207-09 (The question under the second prong on the facts of the case was "whether [the] general prohibition against excessive force was the source for clearly established law that was contravened in the circumstances [the] officer faced."); Wilson v. Layne, 526 U.S. 603, 614-15 (1999) ("It could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police . . . . However, [for the

-24-

second prong] the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."); Anderson v. Creighton, 483 U.S. 635, 639-40 (1987).

This does not mean that the facts of prior cases must be materially similar, but merely that the prior case law must give the officer reasonable notice that the specific conduct she is alleged to have committed in this litigation is unlawful. See Hope, 536 U.S. at 739-46; see also Suboh, 298 F.3d at 94 (second prong does not require that there have been another case "exactly on all fours with the facts of this case").

The district court below erred by posing the second prong as whether "the law regarding the necessity for a search warrant is clear." Riverdale Mills Corp., 337 F. Supp. 2d at 255. This is too abstract an inquiry, at either the first or the second prong.[8] The proper question is whether an officer on October 21, 1997, should have understood based on prior law that it was unlawful, without a warrant or consent, to take industrial wastewater from underneath a manhole cover on a privately-owned street, but headed irretrievably to a public sewer 300 feet away.

---

[8]Similarly, Riverdale argues that the right that needs to be clearly established is the constitutional requirement of a search warrant for a commercial establishment, as set forth in See v. City of Seattle, 387 U.S. 541, 543 (1967). That is surely too broad an articulation in light of the requirements of the second prong.

The law did not clearly establish any such Fourth Amendment right. We have found no court decisions holding that there is a reasonable expectation of privacy in industrial wastewater on its way to a public sewer. The law goes the other way.[9] The most obvious analogy, as we have noted, is between solid waste left out for the trash collector, for which there is usually no reasonable expectation of privacy, and liquid waste flowing into the public sewer system. See Greenwood, 486 U.S. at 40-42; Scott, 975 F.2d at 929; Wilkinson, 926 F.2d at 27; see also United States v. Hall, 47 F.3d 1091, 1093, 1097 (11th Cir. 1995) (no reasonable expectation of privacy for trash in commercial dumpster that was located in employee parking lot reachable via private paved road). Even if Riverdale had a reasonable expectation of privacy in its wastewater at Manhole 1, prior law would not have put an officer on notice that producers of industrial wastewater located underneath a manhole on a private street but headed for a public sewer 300 feet away enjoyed a reasonable expectation of privacy in the wastewater. The officers are entitled to immunity on the second prong of the qualified immunity analysis as well.

---

[9]One state court held that there was not a reasonable expectation of privacy in wastewater that was probed from a manhole within a company's plant, where that wastewater was flowing into the public sewer system. People v. Elec. Plating Co., 683 N.E.2d 465, 469-70 (Ill. App. Ct. 1997).

**IV.**

The district court's denial of qualified immunity to Pimpare and Granz is **<u>reversed</u>,** and the case is remanded for entry of judgment in their favor.  Costs are awarded to Pimpare and Granz.